**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, Derivatively On Behalf of MACY'S, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>TERRY J. LUNDGREN, KAREN M. HOGUET, SARA LEVINSON, CRAIG E. WEATHERUP, JOSPEH NEUBAUER, JOSPEH A. PICHLER, JOYCE M. ROCHE, MEYER FELDBERG, MARNA C. WHITTINGTON, KARL M. VON DER HEYDEN, WILLIAM P. STIRITZ, JOEL A. BELSKY, DENNIS J. BRODERICK, THOMAS G. CODY, THOMAS L. COLE, JANET E. GROVE and SUSAN D. KRONICK,<br><br>Defendants,<br><br>-and-<br><br>MACY'S, INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No. 1:07-cv-05862-RJH<br><br>ECF Case<br><br>**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT**<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by its attorneys, submits this first amended verified shareholder derivative complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by a shareholder of Macy's, Inc. ("Macy's" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law, including violations of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, waste of corporate assets and unjust enrichment that occurred between August 2005 and the present (the "Relevant Period") and that have caused substantial losses to Macy's and other damages, such as to its reputation and goodwill.

2. Macy's is the second-largest department store franchise in the United States with more than 850 department stores in 45 states. The Company operates stores under the names of Macy's and Bloomingdale's. The Company also sells its apparel and accessories, cosmetic, home furnishings and other consumer goods over the internet through macys.com, bloomingdales.com and Bloomingdale's By Mail.

3. Macy's was formerly known as Federated Department Stores, Inc. ("Federated"). In December 2004, Federated began discussing a possible business combination with May Department Stores Co. ("May"). During August 2005, after months of extensive negotiations and due diligence, and despite May's declining sales dating back to 2003, Federated acquired May for $11.7 billion (the "Merger"). The May acquisition doubled the number of Macy's stores to over 800. Effective June 1, 2007, Federated changed its name to Macy's.

4. Prior to consummation of the Merger, May was relying on certain of its investments, including its Bridal Group, to benefit future results. Nonetheless, immediately after acquiring May, Federated divested May's Bridal Group, claiming that "it did not fit with Federated's strategy for focusing on the nationwide Macy's and Bloomingdale's brands."

5. After consummation of the Merger, sales in the May stores continued to lag. The defendants, however, caused or allowed the Company to issue press releases and file documents with

the Securities and Exchange Commission ("SEC"), touting the Merger's success, which artificially inflated the Company's stock.

6.    On September 8, 2005, immediately after completion of the Merger, the defendants caused the Company to file its Form 10-Q for the quarter ended July 30, 2005, stating that the "Company expects that the Merger will be accretive to its earnings per share in 2007." Throughout the Relevant Period, the defendants continued to cause or allow the Company to issue statements emphasizing the Merger's supposed success, while failing to disclose that sales at the former May store locations continued to decline as they had pre-Merger.

7.    Nonetheless, on June 6, 2006, under the defendants' direction, Federated filed its Form 10-K/A for the fiscal year ended January 28, 2006, claiming that the Merger was "expected to accelerate comparable store sales growth." Meanwhile, sales at the former May store locations continued to lag.

8.    On February 8, 2007, under the defendants' direction, Macy's reported preliminary fourth quarter results that significantly exceeded analyst and investor expectations. Specifically, the Company reported earnings of $1.60 per share that exceeded prior guidance of $1.50 per share. Further, the Company forecasted a 2% to 3% increase in same-store sales. As a result, Macy's share price increased dramatically from $41.06 per share on February 7, 2007 to $44.06 per share on February 14, 2007.

9.    During February 2007, Macy's sales figures would include for the first time sales from approximately 400 former May stores that had been converted into Macy's stores in September 2006. Defendants directed Macy's to issue statements forecasting an increase of profitability at the old May stores due to toned down promotional sales programs and offerings of more expensive merchandise and exclusive goods such as Coach handbags and Oscar de La Renta and Alfani branded products.

10.    During the Relevant Period, Macy's public statements portrayed the successful conversion and integration of former May customers and improving sales at the former May store locations. Although sales growth had declined towards the end of 2006, the Company's public

statements continued to report a successful integration process for the former May stores. These statements promised increasing sales growth and wider operating margins.

11.    Macy's Relevant Period statements, however, failed to disclose that the May stores integration was actually failing. As a result, sales growth was continuing to decline and the Company's sales projections were grossly overstated.

12.    Macy's improper statements triggered an artificial inflation of the Company's share price. By March 23, 2007, Macy's share price climbed to as high as $46.70 per share. While Macy's shares were inflated, defendants directed the Company to repurchase over $2 billion of it own shares. Even worse, certain defendants sold their personal shares for over $53 million in proceeds.

13.    Then, between May 10, 2007 and May 15, 2007, Macy's disclosed that May's customers had actually rejected the store conversion and as a result, the Company's sales had declined. In particular, Macy's attributed its damaging sales to its decision to dramatically limit the use of coupons at May stores.

14.    Macy's first quarter 2007 earnings of $5.92 billion fell well short of the Company's forecasted earnings of $6.1 billion. Moreover, the sales growth decline was not industry wide. Sales actually rose 2.2% at J.C. Penney, 4.3% at Target and 9.5% at Nordstroms during the same period.

15.    On these poor results, Macy's was forced to lower its second quarter sales forecast from $6.2 to $6.1 billion and its profit forecast of $0.40-$0.45 earnings per share to $0.35-$0.45 earnings per share. In the wake of the revised forecasts, Macy's value declined 39% from its Relevant Period high as investors lost confidence in the Company's former reputation for accurate financial reporting. Two weeks ago, however, the value of Macy's shares rose slightly due to renewed takeover speculation.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Exchange Act. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

18.    This Court retains general jurisdiction over each named defendant who is a resident of New York. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Macy's maintains operations in New York and is traded on the New York Stock Exchange, and because the allegations contained herein are brought derivatively on behalf of Macy's, defendants' conduct was purposefully directed at New York. Defendants' conduct arose out of New York, where Macy's maintains corporate headquarters. Finally, exercising jurisdiction over the named non-resident defendants is reasonable.

19.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this Complaint, including defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and conspiracy in violation of fiduciary duties owed to Macy's, occurred in substantial part in this District. Finally, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

20.    Plaintiff Pirelli Armstong Tire Corporation Retiree Medical Benefits Trust is, and was at times relevant hereto, an owner and holder of Macy's common stock. Plaintiff is a citizen of Tennessee.

21.    Nominal defendant Macy's is a corporation organized and existing under the laws of the state of Delaware with headquarters located at 151 West 34th Street, New York, New York. Macy's operates department stores. The Company's stores sell a range of merchandise, including

men's, women's, and children's apparel; and accessories, cosmetics, home furnishings, and other consumer goods.

22.    Defendant Terry J. Lundgren ("Lundgren") is Macy's Chairman of the Board of Directors (the "Board") and has been since January 2004.  Lundgren has been a director of the Company since 1997.  Lundgren is also Macy's President and Chief Executive Officer ("CEO") and has been since February 2003.  Macy's paid Lundgren the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $1,383,333 | $6,651,653 | $3,464,675 | $2,704,800 | $1,199,550 | $243,106 |

In 2005, Macy's paid Lundgren the following compensation:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Options Grants – Securities Underlying Options Granted | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $1,292,500 | $2,077,900 | $119,192 | 275,000 | $9,921 |

Lundgren sold 325,000 of his personally held shares for $14,910,482.40 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. Lundgren serves as a Trustee for the Carnegie Hall Corporation ("Carnegie Hall") and as a member of its Corporate Leadership and New Ventures & Technologies Committees.  Defendant Craig E. Weatherup ("Weatherup") previously served as a Trustee of Carnegie Hall along with Lundgren until 2003.    According to Carnegie Hall's Annual Report for 2005-2006, Macy's has been a contributor/corporate donor to Carnegie Hall, donating between $30,000 and $49,999 in 2005/2006 and the Federated Department Stores Foundation donated between $500,000 and $999,999 to the Andrew Carnegie Society.  According to Carnegie Hall's Annual Report for 2005-2006, defendant Weatherup donated between $250,000 and $499,999 to the Andrew Carnegie Society.  Defendant Joseph Neubauer ("Neubauer") is a director of Verizon Communications, Inc. and, according to Carnegie Hall's Annual Report for 2005-2006, the Verizon Foundation donated between $1 million and $2.5 million to the Andrew Carnegie Society and Verizon Communications donated between $50,000 and $99,999 to Carnegie Hall.  Defendant Meyer Feldberg ("Feldberg") has been a Senior Advisor to Morgan Stanley & Co. since 2005 and according to Carnegie Hall's Annual Report for 2005-2006, Morgan Stanly donated between $100,000 and $249,999 to the Andrew Carnegie

Foundation and between $30,000 and $49,999 to Carnegie Hall in corporate sponsorships. Feldberg is also on the board of directors of UBS Global Asset Management ("UBS") and, according to Carnegie Hall's Annual Report for 2005-2006, UBS donated between $12,000 and $19,999 to Carnegie Hall. According to Carnegie Hall's Annual Report for 2005-2006, defendant Karl M. von der Heyden ("von der Heyden") and his wife are listed as members of the "Chairman's Circle" and donated between $15,000 and $19,999 to Carnegie Hall. Lundgren is also the namesake of the Terry Lundgren Center for Retailing at the University of Arizona, Lundgren's alma mater. Macy's has served on the corporate advisory board for the Center for Retailing. According to Macy's most recent proxy statement, Lundgren holds 3,134,328 stock options, 852,352 of which were unexercisable. Lundgren is a named defendant in the securities fraud class action[1] pending in this District. As such, Lundgren faces the threat of millions of dollars in personal liability and it would be against his personal interests to pursue or prosecute the allegations contained herein. Defendant Lundgren is a citizen of New York.

23.     Defendant Karen M. Hoguet ("Hoguet") is Macy's Executive Vice President and has been since June 2005. Hoguet is also Macy's Chief Financial Officer and has been since October 1997. Macy's paid Hoguet the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compen- sation |
|---|---|---|---|---|---|---|---|
| 2006 | $741,667 | $25,000 | $1,235,294 | $877,552 | $724,500 | $296,471 | $79,848 |

Hoguet sold 84,000 of her personally held shares for $3,727,080.00 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. According to Macy's most recent proxy statement, Hoguet holds 773,458 stock options, 226,220 of which were unexercisable. Hoguet is a named defendant in the securities fraud class action pending in this District. As such, Hoguet faces the threat of millions of dollars in personal liability and it would be

---

[1] All references to "the securities fraud class action" pending in this district refer to In re Macy's, Inc. Securities Litigation, Case No. 1:07-CV-04774, filed June 4, 2007.

against her personal interests to pursue or prosecute the allegations contained herein. Defendant Hoguet is a citizen of Ohio.

24.    Defendant Sara Levinson ("Levinson") is a Macy's director and has been since May 1997. Levinson is, and was during the Relevant Period, a member of Macy's Compensation and Management Development Committee and has been since 2005, and is also a member of Macy's Nominating and Corporate Governance Committee. As a member of the Nominating and Corporate Governance Committee, Levinson was responsible for overseeing and evaluating the Company's corporate governance practices, which, as detailed herein, were wholly deficient. Having directly and substantially participated in the wrongdoing in this regard, Levinson is incapable of impartially investigating or prosecuting these allegations. According to Macy's most recent proxy statement, defendant Levinson holds 88,000 stock options, 25,000 of which are unexercisable. In addition, Levinson holds 15,229 stock credits. Levinson sold 7,000 of her personally held shares for $321,335.00 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. Defendant Levinson is a citizen of New York.

25.    Defendant Weatherup is a Macy's director and has been since August 1996. Weatherup is the Chairman of Macy's Compensation and Management Development Committee and has been since 2006 and was a member of the Compensation and Management Development Committee during the Relevant Period, and is, and was during the Relevant Period, a member of Macy's Nominating and Corporate Governance Committee. As a member of the Nominating and Corporate Governance Committee, Weatherup was responsible for overseeing and evaluating the Company's corporate governance practices, which, as detailed herein, were wholly deficient. Having directly and substantially participated in the wrongdoing in this regard, Weatherup is incapable of impartially investigating or prosecuting these allegations. Weatherup served as Chairman and CEO of the Pepsi Bottling Group, Inc. from 1999 to 2003, during which time defendant Susan D. Kronick ("Kronick") served as a member of the board of directors of the Pepsi Bottling Group, Inc. Defendant Weatherup was formerly a Trustee of Carnegie Hall, and served in that position along with defendant Lundgren until 2003. According to Carnegie Hall's Annual Report for 2005-2006, defendant Weatherup donated between $250,000 and $499,999 to the Andrew Carnegie Society.

According to Macy's most recent Proxy Statement, defendant Weatherup holds 88,000 stock options, 25,000 of which are unexercisable. In addition, Weatherup holds 30,891 stock credits. Weatherup sold 7,000 of his personally held shares for $310,393.00 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. Defendant Weatherup is a citizen of Arizona.

26.     Defendant Neubauer is a Macy's director and has been since September 1992. Neubauer is Vice Chairman of Macy's Audit Committee and has been since 2006, and was a member of the Audit Committee during the Relevant Period. As a member of the Audit Committee, Neubauer was responsible for reviewing and approving all of Macy's financial reporting including discussing with Macy's management the Company's quarterly financial statements and annual audited financial statements and was responsible for requiring Macy's to accurately report its financial results. Having directly and substantially participated in the wrongdoing in this regard, Neubauer is incapable of impartially investigating or prosecuting these allegations. Neubauer is also a member of the Compensation and Management Development Committee and has been since 2004, and is, and was during the Relevant Period,  a member of Macy's Nominating and Corporate Governance Committee. As a member of the Nominating and Corporate Governance Committee, Neubauer was responsible for overseeing and evaluating the Company's corporate governance practices, which, as detailed herein, were wholly deficient. Having directly and substantially participated in the wrongdoing in this regard, Neubauer is incapable of impartially investigating or prosecuting these allegations. In addition, Neubauer is a member of the board of directors of Verizon Communications, Inc. According to Macy's most recent Proxy Statement, Macy's purchases its telecommunications network management services from Verizon Communications, Inc. In addition, defendant Lundgren is a Trustee and Committee Member of Carnegie Hall and, according to Carnegie Hall's Annual Report for 2005-2006, the Verizon Foundation donated between $1 million and $2.5 million to the Andrew Carnegie Society and Verizon Communications donated between $50,000 and $99,999 to Carnegie Hall. Defendant Neubauer attended the University of Chicago's Masters in Business Administration ("MBA") program, from which he graduated in 1965; defendant Joseph A. Pichler ("Pichler") received his MBA from the University of Chicago in 1963.

Further, Neubauer is currently a Trustee of the University of Chicago, which received at least $50,000 from Morgan Stanley & Co., for which defendant Feldberg serves as a senior adviser. Neubauer is currently the Chairman and CEO of Aramark, and has been since 1984 and 1983, respectively; during this time, defendant von der Heyden also served as a member of the board of directors of Aramark from 2001-2007. According to Macy's most recent proxy statement, defendant Neubauer holds 88,000 stock options, 25,000 of which are unexercisable. In addition, Neubauer holds 56,483 stock credits. Defendant Neubauer is a citizen of Pennsylvania.

27.    Defendant Pichler is a Macy's director and has been since December 1997. Pichler is also a member of Macy's Compensation and Management Development Committee and has been since 2004, and is, and was during the Relevant Period, also a member of Macy's Nominating and Corporate Governance Committee. As a member of the Nominating and Corporate Governance Committee, Pichler was responsible for overseeing and evaluating the Company's corporate governance practices which, as detailed herein, were wholly deficient. Having directly and substantially participated in the wrongdoing in this regard, Pichler is incapable of impartially investigating or prosecuting these allegations. Pichler received his MBA from the University of Chicago in 1963, two years before Neubauer received his MBA from the same graduate program. According to Macy's most recent proxy statement, defendant Pichler holds 81,000 stock options, 25,000 of which are unexercisable. In addition, Pichler holds 13,371 stock credits. Defendant Pichler is a citizen of Ohio.

28.    Defendant Joyce M. Roche ("Roche") is a Macy's director and has been since February 2006. Roche is a member of both the Audit Committee and the Nominating and Corporate Governance Committee and has been a member of each since 2006. As a member of the Audit Committee, Roche was responsible for reviewing and approving all of Macy's financial reporting, as well as discussing with Macy's management the Company's quarterly financial statements and annual audited financial statements, and was responsible for requiring Macy's to accurately report its financial results. As a member of the Nominating and Corporate Governance Committee, Roche was responsible for overseeing and evaluating the Company's corporate governance practices, which, as detailed herein, were wholly deficient. Having directly and substantially participated in

- 9 -

the wrongdoing in these regards, Roche is incapable of impartially investigating or prosecuting these allegations. Prior to the acquisition of May by Macy's, Roche served on the board of directors of May with defendant William Stiritz ("Stiritz"). Roche also served on May's Audit Committee from 2003, which was responsible for, among other things: (i) discussing with management and the independent auditor significant financial reporting issues; (ii) reviewing and discussing reports from the independent auditor on all critical accounting policies and practices to be used; (iii) discussing with management May's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and (iv) discussing with management and major financial risk exposures and the steps management has taken to monitor and control such exposures. Roche and Stiritz also served together on May's Nominating and Governance Committee. According to Macy's most recent proxy statement, defendant Roche holds 10,000 stock options, all of which are currently unexercisable. In addition, Roche holds 1,926 stock credits. Defendant Roche is a citizen of New York.

29.    Defendant Feldberg is a Macy's director and has been since May 1992. Feldberg is also Vice Chairman of Macy's Compensation and Management Development Committee and has been since 2006, and was a member of the Compensation and Management Development Committee during the Relevant Period, and is and was during the Relevant Period a member of Macy's Nominating and Corporate Governance Committee. As a member of the Nominating and Corporate Governance Committee, Feldberg was responsible for overseeing and evaluating the Company's corporate governance practices, which, as detailed herein, were wholly deficient. Having directly and substantially participated in the wrongdoing in this regard, Feldberg is incapable of impartially investigating or prosecuting these allegations. Feldberg has been a Senior Advisor to Morgan Stanley & Co. since 2005; Morgan Stanley & Co. acted as financial advisor to May's board of directors in connection with the Merger between Macy's and May. Additionally, Morgan Stanley & Co. donated significant funds to the Carnegie Hall Corporation, of which defendant Lundgren is a Trustee and defendant Weatherup is a former Trustee. According to Carnegie Hall's Annual Report for 2005-2006, Morgan Stanley donated between $100,000 and $249,999 to the Andrew Carnegie Foundation and between $30,000 and $49,999 to Carnegie Hall in corporate sponsorships. Feldberg

is also on the board of directors of UBS Global Asset Management and, according to Carnegie Hall's Annual Report for 2005-2006, UBS donated between $12,000 and $19,999 to Carnegie Hall. Morgan Stanley & Co. also recently donated significant funds, $50,000 or more, to the University of Chicago, where defendant Neubauer serves as Trustee, and where defendants Neubauer and Pichler received their MBAs. Further, Macy's is a sponsor of the Meyer Feldberg Distinguished Fellowship program at the University of Columbia, from which Feldberg received his PhD in Management and Strategy in 1965. According to Macy's most recent proxy, defendant Feldberg holds 81,000 stock options, 25,000 of which are unexercisable. In addition, Feldberg holds 4,787 stock credits. Defendant Feldberg is a citizen of New York.

30.    Defendant Marna C. Whittington ("Whittington") is a Macy's director and has been since June 1993. Whittington is also Chairman of Macy's Audit Committee and has been since 2004. As a member of the Audit Committee, Whittington was responsible for reviewing and approving all of Macy's financial reporting including discussing with Macy's management the Company's quarterly financial statements and annual audited financial statements and was responsible for requiring Macy's to accurately report its financial results. Having directly and substantially participated in the wrongdoing in this regard, Whittington is incapable of impartially investigating or prosecuting these allegations. Whitting is also Vice Chairman of the Finance Committee and has been since 2006, and was a member of the Finance Committee during the Relevant Period. As a member of the Finance Committee, Whittington was responsible for reviewing with management and providing information to the Board on Macy's stock repurchase programs including the Company's repurchase of over $2 billion of its own shares as detailed herein. Having directly and substantially participated in the wrongdoing in this regard, Whittington is incapable of impartially investigating or prosecuting these allegations. According to Macy's most recent proxy statement, defendant Whittington holds 88,000 stock options, 25,000 of which are unexercisable. In addition, Whittington holds 21,665 stock credits. Defendant Whittington is a citizen of Delaware.

31.    Defendant von der Heyden is a Macy's director and has been since February 1992. Von der Heyden is also a member of Macy's Compensation and Management Development

Committee and has been since 2006. Since 2006, von der Heyden has been Chairman of the Finance Committee, and was a member of the Finance Committee during the Relevant Period. As a member of the Finance Committee, von der Heyden was responsible for reviewing with management and providing information to the Board on Macy's stock repurchase programs including the Company's repurchase of over $2 billion of its own shares as detailed herein. Having directly and substantially participated in the wrongdoing in this regard, von der Heyden is incapable of impartially investigating or prosecuting these allegations. During 2005, von der Heyden served on Macy's Audit Committee. As a member of the Audit Committee, von der Heyden was responsible for reviewing and approving all of Macy's financial reporting including discussing with Macy's management the Company's quarterly financial statements and annual audited financial statements and was responsible for requiring Macy's to accurately report its financial results. Having directly and substantially participated in the wrongdoing in this regard, von der Heyden is incapable of impartially investigating or prosecuting these allegations. Von der Heyden previously served as a member of the board of directors of Aramark, from 2001-2007, during which Neubauer served as Aramark's Chairman and CEO. According to Carnegie Hall's Annual Report for 2005-2006, defendant von der Heyden and his wife are listed as members of the "Chairman's Circle" and donated between $15,000 and $19,999 to Carnegie Hall where defendant Lundgren is a Trustee. According to Macy's most recent proxy statement, defendant von der Heyden holds 81,000 stock options, 25,000 of which are unexercisable. In addition, von der Heyden holds 43,942 stock credits. Defendant von der Heyden is a citizen of Connecticut.

32.    Defendant Stiritz was a Macy's director from October 2005 to May 2007. Stiritz was also a member of Macy's Audit Committee from October 2005 to May 2007 and a member of the Finance Committee from October 2005 to May 2007. As a member of the Audit Committee, Stiritz was responsible for reviewing and approving all of Macy's financial reporting including discussing with Macy's management the Company's quarterly financial statements and annual audited financial statements and was responsible for requiring Macy's to accurately report its financial results. As a member of the Finance Committee, Stiritz was responsible for reviewing with management and providing information to the Board on Macy's stock repurchase programs including the Company's

repurchase of over $2 billion of its own shares as detailed herein. Having directly and substantially participated in the wrongdoing in these regards, Stiritz is incapable of impartially investigating or prosecuting these allegations. Prior to the acquisition of May by Macy's, Stiritz served on May's board of directors with defendant Roche. Stiritz also served on May's Finance Committee, which was responsible, among other things, for recommending to May's board of directors financial policies, long-term financial plans and targets, capital expenditure programs and financial aspects of proposed acquisitions and divestitures. Defendants Roche and Stiritz also served together on May's Nominating and Governance Committee. According to Macy's most recent proxy statement, defendant Stiritz holds 11,666 stock options, 11,248 of which are currently unexercisable. In addition, Stiritz holds 3,279 stock credits. Defendant Stiritz is a citizen of Colorado.

33.    Defendant Joel A. Belsky ("Belsky") is Macy's Vice President/Controller and has been since 1996. Belsky sold 10,000 of his personally held shares for $461,500 in proceeds while in possession of material, non-public information concerning Macy's. Belsky is a citizen of Ohio.

34.    Defendant Dennis J. Broderick ("Broderick") is Macy's Senior Vice President and General Counsel and has been since 1990. Broderick is also Macy's Secretary and has been since 1993. Broderick sold 68,400 of his personally held shares for $3,104,028 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. Broderick is a citizen of Ohio.

35.    Defendant Thomas G. Cody ("Cody") is Macy's Vice Chair responsible for Macy's legal and human resources, internal audit, external affairs and the Company's philanthropic activities and has been since 2003. In 2006, Macy's paid Cody the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compen- sation |
|---|---|---|---|---|---|---|---|
| 2006 | $792,500 | $225,000 | $2,256,147 | $529,213 | $772,800 | $694,345 | $211,405 |

In 2005, Macy's paid Cody the following compensation:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Options Grants – Securities Underlying Options Granted | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $775,000 | $603,400 | $169,703 | 32,500 | $9,921 |

Cody sold 185,000 of his personally held shares for $8,259,165 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. According to Macy's most recent proxy statement, Cody holds 757,690 stock options, 152,720 of which were not exercisable. Defendant Cody is a citizen of Kentucky.

36.    Defendant Thomas L. Cole ("Cole") is Macy's Vice Chair responsible for store design and construction and corporate real estate functions, as well as Logistics and Operations, Systems and Technology and Credit and Customer Services Group divisions and has been since 2003. In 2006, Macy's paid Cole the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compen- sation |
|---|---|---|---|---|---|---|---|
| 2006 | $883,333 | $25,000 | $1,691,762 | $1,023,142 | $869,400 | $444,407 | $58,045 |

In 2005, Macy's paid Cole the following compensation:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Options Grants – Securities Underlying Options Granted | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $781,250 | $639,400 | $84,028 | 32,500 | $9,921 |

Cole sold 185,450 of his personally held shares for $8,566,309.50 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. According to Macy's most recent proxy statement, Cole holds 768,400 stock options, 302,720 of which were not exercisable. Defendant Cole is a citizen of New York.

37.    Defendant Janet E. Grove ("Grove") is Macy's Vice Chair and has been since 2003. In addition, Grove serves as Chairman of Macy's Merchandising Group. In 2006, Macy's paid Grove the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compen- sation |
|---|---|---|---|---|---|---|---|
| 2006 | $883,333 | $25,000 | $1,702,317 | $1,023,142 | $869,400 | $348,355 | $57,026 |

In 2005, Macy's paid Grove the following compensation:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Options Grants – Securities Underlying Options Granted | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $781,250 | $639,400 | $0 | 32,500 | $9,921 |

Grove sold 202,762 of her personally held shares for $9,114,258.77 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. According to Macy's most recent proxy statement, Grove holds 860,318 stock options, 302,720 of which were not exercisable. Defendant Grove is a citizen of New York.

38.    Defendant Kronick is Macy's Vice Chair responsible for all of the Company's department store divisions and has been since 2003. Kronick serves as a member of the board of directors of the Pepsi Bottling Group Inc., a position she held while defendant Weatherup served as the Pepsi Bottling Group Inc.'s Chairman and CEO. In 2006, Macy's paid Kronick the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $1,042,500 | $25,000 | $1,978,004 | $1,146,552 | $1,014,300 | $475,305 | $58,535 |

In 2005, Macy's paid Kronick the following compensation:

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Options Grants – Securities Underlying Options Granted | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $1,005,000 | $803,200 | $62,987 | 32,500 | $9,921 |

Kronick sold 114,500 of her personally held shares for $5,095,250 in proceeds while in possession of material, non-public information concerning Macy's financials and operations. According to Macy's most recent proxy statement, Kronick holds 932,202 stock options, 352,720 of which are unexercisable. Defendant Kronick is a citizen of Florida.

39.    The defendants identified in ¶¶22, 24-32, referred to herein as the "Director Defendants." The defendants identified in ¶¶22-23, 33-38 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶22-25, 33-38 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and Insider Selling Defendants are referred to herein as the "Individual Defendants."

40.    Because of their positions, each of the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Macy's including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections

with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, as well as reports and other information provided to them in connection therewith.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

41.    By reason of their positions as officers, directors and/or fiduciaries of Macy's and because of their ability to control the business and corporate affairs of Macy's, the Individual Defendants owed Macy's and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Macy's in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Macy's and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

42.    Each director and officer of the Company owes to Macy's and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Macy's, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Macy's, and defendants Stiritz and Roche's director and committee positions at May prior to the Merger, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations and improper representations of Macy's.  Moreover, each of the Individual Defendants, and particularly members of the Board, would have been privy to all due diligence information concerning May's financials in connection with the Merger.

- 16 -

44.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Macy's, and was at all times acting within the course and scope of such agency.

45.    To discharge their duties, the officers and directors of Macy's were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Macy's were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the Securities and Exchange Commission ("SEC") and the investing public;

(c)    conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how Macy's conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

46.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and

the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Macy's, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Macy's Board during the Relevant Period.

47.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. As a result, Macy's has expended, and will continue to expend, significant sums of money.

48.    Moreover, these actions have irreparably damaged Macy's corporate image and goodwill. The Individual Defendants have misled the investing public, such that Macy's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly portraying its business prospects, in order to allow the Individual Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Macy's and the profits, power and prestige that the

Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Macy's, regarding the Individual Defendants' management of Macy's operations, the integration of May stores, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by the Individual Defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

51.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least August 2005 and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true fact that May sales were declining both pre-Merger and post-Merger and evidenced no intention to turnaround and thus, Macy's was misrepresenting its business prospects. In addition, the Individual Defendants also made other specific, improper statements about Macy's financial performance and future business prospects, as alleged herein.

52.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Macy's common stock so they could: (i) dispose of over $53 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

53.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business prospects and release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

54.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## THE BOARD OF DIRECTORS

### A.    Committees of the Board

55.    The standing committees of the Board include: (i) the Audit Committee; (ii) the Compensation and Management Development Committee; (iii) the Finance Committee; and (iv) the Nominating and Corporate Governance Committee.  In connection with their service on the Board, for fiscal years 2005 and 2006, each non-employee director received a $60,000 annual retainer and an additional $2,000 for each meeting of the Board or Board committee meeting attended and for each review session with one or more members of management.  Each committee chairperson received an annual retainer of $10,000.  In addition, non-employee directors were eligible to receive up to 5,000 stock options in 2005 and 10,000 stock options in 2006.

### 1.    Audit Committee

56.    Defendants Neubauer, Roche, Whittington are currently and have been members of the Audit Committee at all times relevant hereto.  Defendant Stiritz was a member of the Audit Committee in fiscal years 2005 and 2006 and retired from the Board in April 2007 after reaching the Company's mandatory retirement age for directors.  Defendant von der Heyden was a member of the Audit Committee during fiscal year 2005.  In addition to its regular consultation with Macy's management, the Audit Committee met five times in 2006, and five times in 2005.  According to the Audit Committee's Charter, "[t]he purpose of the Audit Committee ... of the Board of Directors ... is to assist the Board in its oversight of the integrity of the Company's financial statements, compliance with legal and regulatory requirements, qualifications and independence of the Company's independent auditors and the performance of the Company's independent auditors and internal audit function, and to prepare the audit committee report for inclusion in the Company's annual proxy

statement." Further, the Audit Committee Charter provides that the responsibilities of the Audit Committee include:

### C. Responsibilities

\* \* \*

### Financial Information and Periodic SEC Reports

10.    Discuss with management and the independent auditors the Company's quarterly financial statements and annual audited financial statements, including any material financial reporting issues and significant judgments made in connection with the preparation of the financial statements and the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

11.    Review the Company's reports on Form 10-Q and 10-K before they are filed with the SEC, including the Company's critical accounting policies and any changes to those policies or their application, disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and management's certification of such statements. Review with management and the independent auditors any correspondence with the SEC or the NYSE regarding material issues relating to the Company's financial statements.

12.    Based on the Committee's review and discussion of the Company's annual financial statements with management and the independent auditors, make a recommendation to the Board regarding the inclusion of the annual financial statements in the Company's Annual Report on Form 10-K.

13.    Report to shareholders in the Company's annual proxy statement on those Committee matters required by SEC rules.

14.    Discuss the type of information to be provided and the type of presentation to be made in connection with the Company's earnings releases and financial information and earnings guidance provided to analysts and ratings agencies.

15.    Review regulatory and accounting initiatives and their effect on the Company's financial statements.

### Internal and Disclosure Controls

16.    Review with management, the independent auditors and the senior-most internal auditor, the adequacy of the Company's internal controls and disclosure controls.

17.    Review with management and the independent auditors any significant deficiencies in the design or operation of internal controls. Review with

management and the independent auditors any fraud involving management or employees having a significant role in internal controls.

**Corporate Oversight**

18. Monitor the Company's compliance with applicable laws and regulations.

19. Discuss policies with respect to the Company's risk assessment and risk management.

20. Establish and maintain hiring policies for employees or former employees of the independent auditors, which include the restrictions required under the rules of the New York Stock Exchange and the Sarbanes-Oxley Act and any rules promulgated thereunder by the SEC.

21. Establish procedures for the Committee to receive, retain and respond to complaints regarding accounting, internal accounting controls, and auditing matters, as well as for confidential, anonymous submission by employees of concerns related to questionable accounting or auditing matters.

22. The Committee shall report its activities to the Board in such manner and at such times as the Committee, or the Chairperson, deems appropriate, but in no event less frequently than once a year.

23. The Committee shall annually evaluate the performance and effectiveness of the Committee including with respect to its discharge of the responsibilities set forth in this Charter. The Committee shall annually conduct and review with the Board an evaluation of this Charter and recommend any changes to the Board for approval.

**2.    Compensation and Management Development Committee**

57.    Defendants Feldberg, Levinson, Neubauer, Pichler and Weatherup are and have been members of the Compensation and Management Development Committee at all times relevant hereto. Defendant von der Heyden was a member of the Compensation and Management Development Committee in 2006. In addition to its regular consultation with Macy's management, the Compensation and Management Development Committee met eight times in 2006, and seven times in 2005. According to its charter, "[t]he purpose of the Compensation and Management Development Committee ... of the Board ... is to establish and administer the Company's policies, programs and procedures for the annual and long-term compensation of the company's executives, to oversee employee benefit programs and to ensure appropriate succession plans for the CEO and key executive positions."