### 3.    Finance Committee

58.    Defendants von der Heyden and Whittington have been members of the Finance Committee at all times relevant hereto.  Defendant Stiritz was a member of the Finance Committee in fiscal years 2005 and 2006 and retired from the Board in April 2007 after reaching the Company's mandatory retirement age for directors.   In addition to its regular consultation with Macy's management, the Finance Committee met eight times in 2006 and nine times in 2005.  According to the Finance Committee's Charter, the duties conferred on the Finance Committee include:

> To review with the appropriate officers of the Company and consider and provide information to the Board ... on:

> (a)    the financial considerations relating to the acquisition of businesses or divestiture of Company operations that require Board approval;

> (b)    debt or equity transaction, including, for example, financings, refinancings, the issuance of new common or preferred stock and stock repurchase programs, that require Board approval;

> (c)    changes in the financial policy or structure of the Company as may have a material financial impact on the Company as a whole;

> (d)    capital projects, whether or not included in the capital budge [sic], and other financial commitments if the cost or undertaking associated therewith is in excess of $25 million; and

> (e)    Company consolidations of operations where the projected cost of the consolidation and/or expense savings resulting from the consolidation exceeds $25 million.

### 4.    Nominating and Corporate Governance Committee

59.    Defendants Feldberg, Levinson, Neubauer, Pichler, and Weatherup have been members of the Nominating and Corporate Governance Committee at all times relevant hereto. Defendant Roche has been a member of the Nominating and Corporate Governance Committee since 2006.  In addition to its regular consultation with Macy's management, the Nominating and Corporate Governance Committee met five times in 2006, and six times in 2005.  According to its charter, "[t]he purpose of the Nominating and Corporate Governance Committee ... of the Board ... is to identify and recommend to the Board for election at the annual meeting of shareholders ... and/or appointment qualified candidates for membership on the Board and its committees, consistent

with criteria approved by the Board, and to oversee the evaluation of the Board and the Company's corporate governance practices."

## IMPROPER STATEMENTS

60.    The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Macy's a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

61.    This material, non-public information principally included the fact that the May integration was failing and would result in lower sales.  Furthermore, defendants Neubauer, Roche, Whittington and Stiritz, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the committee is responsible for reviewing and discussing: (i) the Company's earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies; and (ii) the adequacy of the Company's internal and disclosure controls.

62.    Moreover, defendants Stiritz and Roche, as former directors of May and members of its Finance Committee and Audit Committee, respectively, knew details about May's business condition prior to the Merger, including its historical decline in sales dating back to 2003.  For example May's Form 10-Q for the quarter ended October 20, 2004 stated in relevant part:

> The weakening sales trend that began in the 2004 second quarter continued throughout the 2004 third quarter, resulting in sales below our expectations … [E]xpenses as a percent of net sales increased  due to the decreased sales leverage resulting from negative store-for-store sales.

63.    On May 10, 2005, May filed its Form 10-K/A for the fiscal year ended January 29, 2005, and reported that "[o]perating results for 2004 were not in line with our expectations." "The 2004 decrease in store-for-store sales was characterized by a decrease in the number of department store transactions." "The 2003 decrease in store-for-store sales was characterized by a decrease in both the number of department store transactions and the average selling price per item."

64.    May's declining sales through 2003 and 2004 continued into 2005.  On May 27, 2005, May filed its Form 10-Q for the quarter ended April 30, 2005, and reported that "[d]uring the first quarter of 2005, overall sales were disappointing."  "Sales of our proprietary ladies' and mens' apparel brands were among the weakest performing categories, and the home store continued to lag."

65.    Indeed, May's sales were declining for years leading up to the Merger and continued to decline while the Board undertook due diligence in connection with the Merger.  Through its due diligence, each member of the Board knew or should have known that May's history of declining sales would continue to plague the post-Merger company.  In fact, May's only hope that its history of declining sales would turn around hinged on the success of certain of its investments such as May's Bridal Group.  Macy's first course of action after consummating the Merger, however, was the divestment of May's Bridal Group.

66.    Specifically, Federated's Chairman, President and CEO, defendant Lundgren, announced Federated's decision to divest of the Bridal Group, claiming that it "did not fit with Federated's strategy for focusing on the nationwide Macy's and Bloomingdale's brands."   After divesting several former May stores, Federated had an increase of approximately 450 department stores operating under either the Macy's or Bloomingdale's name.   Meanwhile, sales at the former May stores continued to decline.

67.    Defendant Lundgren, as Federated's President, CEO and Chairman, represented Federated in its negotiations with May.  Defendants Feldberg, Whittington, Weatherup, Levinson, Neubauer, Pichler and von der Heyden were also members of Federated during its negotiations with May.  Defendant Stiritz had a "special role" in the business combination discussions on behalf of May.  As a result of the due diligence conducted in connection with the Merger negotiations, these defendants knew or should have known about May's history of decreasing sales dating back to 2003 and its reliance on certain investments such as its Bridal Group to overcome these difficulties.  These defendants also knew or should have known that Federated's success hinged on the successful integration of the former May stores.  Nonetheless, knowing of May's pre-Merger lagging sales, these defendants approved the Merger and began touting the Company's alleged success.  While Macy's was suffering from declining sales growth, weak comparable store sales and two consecutive

periods of double-digit percentage declines in cash flows, the Company continued to raise its earnings guidance.

68.     Defendants Lundgren, Huguet, Belsky, Broderick, Cody, Cole, Grove and Kronick as officers of Macy's, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Lundgren, Neubauer, Roche, Whittington, Pichler, Feldberg, von der Heyden, Levinson, Weatherup and Stiritz, as directors of Macy's had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Macy's to the investing public and the Company's shareholders during the Relevant Period.

69.     On September 8, 2005, a week after Macy's completed the acquisition of May, the Individual Defendants caused or allowed the Macy's to file its Form 10-Q for the fiscal quarter ended July 30, 2005. The 10-Q announced the Company's expected increase in earnings as a result of the Merger. The Form 10-Q stated in relevant part:

> ***The Merger is expected to have a material effect on the Company's consolidated financial position, results of operations and cash flows.*** May's reported net sales and net earnings for the 26 weeks ended July 30, 2005 were $6,815 million and $93 million, respectively. May's reported total assets and total liabilities (including ESOP preference shares) at July 30, 2005 were $15,069 million and $10,168 million, respectively. May's reported long-term debt (including the current portion thereof) at July 30, 2005 was $5,798 million. ***The Company expects that the Merger will be accretive to its earnings per share in 2007.*** The Company expects to realize approximately $450 million in annual cost savings by 2007, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company. In addition, the Company anticipates incurring approximately $1 billion in one-time costs related to the acquisition and integration, spread out over a three-year period, commencing after the acquisition in 2005.

70.     On December 8, 2005, the Individual Defendants caused or allowed the Company to file its Form 10-Q for the fiscal quarter ended October 29, 2005. The 10-Q continued to tout the Merger's supposed success and positive impact on the Company's financials. Meanwhile, Macy's

shareholders and the investing public were unaware of the continuing decline in sales at the former

May store locations.  The Form 10-Q stated in relevant part:

> *The Merger is expected to have a material effect on the Company's consolidated financial position, results of operations and cash flows. The Company expects to realize approximately $175 million of cost savings in 2006 and $450 million of annual cost savings starting in 2007, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company.* In addition, the Company anticipates incurring approximately $1 billion in one-time costs related to the acquisition and integration, spread out over a three-year period, commencing after the acquisition in 2005.

71.    On April 13, 2006, the Individual Defendants caused or allowed the Company to file

its Form 10-K for the fiscal year ended January 28, 2006.  The 10-K emphasized the alleged success

of the post-Merger company, including the Company's increase in net sales and improved operating

performance.  The 10-K failed to mention that the integration of former May stores was failing.  The

Form 10-K stated in relevant part:

> *With the acquisition of May, the Company's business has grown dramatically. Accordingly, sales, number of stores and number of associates have grown and likely will continue to grow.* This growth places significant demands on management and operational systems. If the Company is unable to effectively manage its growth, operational inefficiencies could occur and, as a result, the Company's business and results of operations could be materially and adversely affected.

> \* \* \*

> Net sales for 2005 totaled $22,390 million, compared to net sales of $15,776 million for 2004, an increase of 41.9%. Net sales for September 2005 through January 2006 include the continuing operations of May. On a comparable store basis (sales from Bloomingdale's and Macy's stores in operation throughout 2004 and 2005 and all Internet sales and mail order sales from continuing businesses), net sales increased 1.3% compared to 2004. Sales in 2005 were strongest at Bloomingdale's and Macy's Florida. Sales of the Company's private label brands continued to be strong in 2005 in all Macy's-branded stores. By family of business, sales in 2005 were strong in shoes, handbags, cosmetics and fragrances and men's and women's sportswear. The weaker businesses during 2005 continued to be in the home-related areas.

> \* \* \*

> Net cash provided by continuing operating activities in 2005 was $1,950 million, compared to the $1,507 million provided in 2004, *reflecting improved operating performance, including the impact of the acquisition of May*.

72.     On June 6, 2006, the Individual Defendants caused or allowed the Company to file its Form 10-K/A for the fiscal year ended January 28, 2006.  Rather than disclosing the decline in sales at the former May stores locations, the 10-K/A continued to tout the Merger's success and specifically stated that the Merger was "expected to accelerate comparable stores sales growth."  The 10-K/A stated in relevant part:

> *The Merger is expected to have a material effect on the Company's consolidated financial position, results of operations and cash flows.* The Company expects to realize approximately $175 million of cost savings in 2006 and $450 million of annual cost savings starting in 2007, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company. *The Merger is also expected to accelerate comparable store sales growth.* In addition, the Company anticipates incurring approximately $1.0 billion in one-time costs related to the acquisition and integration, spread out over a three-year period, commencing after the acquisition in 2005.

*   *   *

> *Comparison of the 52 Weeks Ended January 28, 2006 and the 52 Weeks Ended January 29, 2005.* Net income for 2005 increased to $1,406 million compared to $689 million for 2004. Net income for 2005 includes income from discontinued operations of $33 million. *The increase in income from continuing operations in 2005 reflects the $480 million gain on the sale of the FDS Credit Assets as well as the impact of the acquisition of May.*

*   *   *

> Net cash provided by continuing operating activities in 2005 was $4,145 million, compared to the $1,507 million provided in 2004, *reflecting improved operating performance, including the impact of the acquisition of May,* and the proceeds from the sale of the proprietary account portion of the FDS Credit Assets.

73.     On September 7, 2006, the Individual Defendants caused or allowed the Company to file its Form 10-Q for the fiscal quarter ended July 29, 2006.  The 10-Q continued to ignore the failing integration of former May stores, and instead claimed that the Merger is "expected to accelerate comparable store sales growth.

> *The Merger has had and is expected to continue to have a material effect on the Company's consolidated financial position, results of operations and cash flows.* The Company continues to expect to realize approximately $175 million of cost savings in 2006 and at least $450 million of annual cost savings starting in 2007, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company with respect to systems, logistics, store operations and credit management. *The Merger is also expected to*

- 28 -

*accelerate comparable store sales growth.* The Company anticipates incurring approximately $344-$419 million of May integration costs (including inventory valuation adjustments) in the remaining two quarters of fiscal 2006.

74.     On February 8, 2007, the Individual Defendants caused or allowed the Company to issue a press release titled "Federated's January Same-Store Sales up 8.6% - Company Raises Earnings Guidance for Fiscal 2006 Fourth Quarter." The press release proclaimed increased guidance and sales prospects for the coming quarter and momentum carrying into 2007. The release stated in relevant part:

> The company *increased its guidance* for earnings from continuing operations for the fourth quarter of fiscal 2006. Excluding merger integration costs and related inventory valuation adjustments, the company now expects fourth quarter earnings from continuing operations of $1.55 to $1.60 per share, compared with previous guidance of $1.40 to $1.50 per share. The revised guidance includes a one-time gain of 6 cents per share related to completion of its debt tender offer, as announced in December 2006.
>
> "January represented a strong finish to our fiscal year, with an outstanding performance in legacy Macy's and Bloomingdale's stores, as well as continued *improvement in sales trends* at former May Company locations," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "Sales were stimulated in part by redemption of gift cards sold during the holiday season and the arrival of cold weather in much of the country."
>
> "All in all, 2006 was a great year in which we transformed our company and embraced an extraordinary amount of positive change while exceeding our initial earnings targets," Lundgren said. "This is a testament to the strategy we have put in place and to the strength of our organization. We look forward to this *momentum carrying into 2007*."
>
> Federated expects same-store sales to *increase by 2 percent to 3 percent* in February. Beginning in February, Federated's same-store sales will include former May Company locations, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year.

75.     On April 4, 2007, the Individual Defendants caused or allowed the Company to file its Form 10-K for the fiscal year ended February 3, 2007. The 10-K continued to publicize the supposed success of the Merger, ignore the declining sales at former May stores locations, and thereby artificially inflate Macy's stock.

> *The Merger has had and is expected to continue to have a material effect on the Company's consolidated financial position, results of operations and cash flows.* The Company was able to realize more than $175 million of cost savings in 2006 and expects to realize at least $450 million of annual cost savings starting in

2007, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company with respect to systems, logistics, store operations and credit management, all of which have been substantially completed as of February 2007. *The Merger is also expected to accelerate comparable store sales growth.* The Company has incurred approximately $628 million and $194 million of merger integration costs and related inventory valuation adjustments in 2006 and 2005, respectively. In addition, the Company anticipates incurring approximately $100 to $125 million of May integration costs during fiscal 2007, which ends February 2, 2008.

76.     These public disclosures contained false and misleading statements because the Individual Defendants knew of May's pre and post-Merger sales lag, but nonetheless touted its "improvement" and pumped up Macy's stock through increased, yet knowingly unattainable, guidance for same-store sales.

77.     The 2005 through 2007 Forms 10-Q and Forms 10-K were reviewed, prepared and/or endorsed by the Individual Defendants. Specifically, the following chart details the defendants and other individuals who signed filings:

| Date | Filing | Defendants Who Signed and Certified |
|------|--------|-------------------------------------|
| 9/8/2005 | 10-Q | Broderick (Senior Vice President, General Counsel and Secretary), Belsky (Vice President, Controller and Principal Accounting Officer) **SOX Certification:** Lundren (CEO), Hoguet (CFO) |
| 12/8/2005 | 10-Q | Broderick (Senior Vice President, General Counsel and Secretary), Belsky (Vice President, Controller and Principal Accounting Officer) **SOX Certification:** Lundren (CEO), Hoguet (CFO) |
| 4/13/2006 | 10-K | Lundren (CEO), Hoguet (CFO), Belsky (Vice President, Controller and Principal Accounting Officer), Feldberg (Director), Levinson (Director), Neubauer (Director), Pichler (Director), Roche (Director), Stiritz (Director), Heyden (Director), Weatherup (Director), Whittington (Director) **SOX Certification:** Lundren (CEO), Hoguet (CFO) |
| 6/6/2006 | 10-K/A | Lundren (CEO), Hoguet (CFO), Belsky (Vice President, Controller and Principal Accounting Officer), Feldberg (Director), Levinson (Director), Neubauer (Director), Pichler (Director), Roche (Director), Stiritz (Director), Heyden (Director), Weatherup (Director), Whittington (Director) **SOX Certification:** Lundren (CEO), Hoguet (CFO) |
| 9/7/2006 | 10-Q | Broderick (Senior Vice President, General Counsel and Secretary), Belsky (Vice President, Controller and Principal Accounting Officer) **SOX Certification:** Lundren (CEO), Hoguet (CFO) |
| 12/7/2006 | 10-Q | Broderick (Senior Vice President, General Counsel and Secretary), Belsky (Vice President, Controller and Principal Accounting Officer) **SOX Certification:** Lundren (CEO), Hoguet (CFO) |
| 4/4/2007 | 10-K | Lundren (CEO), Hoguet (CFO), Belsky (Vice President, Controller and Principal Accounting Officer), Feldberg (Director), Levinson (Director), Neubauer (Director), Pichler (Director), Roche (Director), Stiritz (Director), Heyden (Director), Weatherup (Director), Whittington (Director) **SOX Certification:** Lundren (CEO), Hoguet (CFO) |

78.     The SOX certifications signed in conjunction with the filing of Macy's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to Macy's 2007 Form 10-K that was signed by defendants Lundgren and Hoguet.

I, [Terry J. Lundgren], certify that:

1.     I have reviewed this Annual Report on Form 10-K of Federated Department Stores, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has

- 31 -

materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting

## SHARE REPURCHASE

79.     On February 26, 2007, Macy's Board approved an additional $4 billion authorization to the Company's share repurchase program.   Immediately after the authorization, under the Individual Defendants' direction, the Company repurchased 45 million of its own shares for approximately $2 billion.

## FURTHER IMPROPER STATEMENTS

80.     On February 27, 2007, the Individual Defendants caused or allowed the Company to issue a press release reporting its fiscal 2006 earnings.   The press release was titled "Federated Reports Fourth Quarter Earnings of $1.45 Per Diluted Share from Continuing Operations; Diluted EPS From Continuing Operations, Excluding Merger Integration Costs and Inventory Valuation Adjustments, is $1.66 - Exceeding the Company's Guidance." The press release stated in relevant part:

Federated Department Stores, Inc. today reported diluted earnings per share from continuing operations of $1.45 for the 14-week fourth quarter of 2006, ended Feb. 3, 2007. This compares with diluted earnings per share from continuing operations of $1.22 for the 13-week period ended Jan. 28, 2006.

Excluding May Company merger integration costs and related inventory valuation adjustments of $177 million ($110 million after tax or 21 cents per diluted share), fourth quarter diluted earnings per share from continuing operations were $1.66. This *exceeds the company's prior guidance*, provided on Feb. 8, 2007, for

- 32 -

earnings of $1.55 to $1.60 per share excluding merger integration costs and related inventory valuation adjustments. Earnings for the 2006 fourth quarter include a gain of approximately $54 million ($34 million after tax or 6 cents per diluted share) related to completion of the company's debt tender offer, as previously announced.

81.     On March 8, 2007, the Individual Defendants caused or allowed the Company to issue a press release titled "Federated's February Same-Store Sales Up 1.2%." The press release reported flat sales for the month of February. The press release blamed the lacking sales on the weather. Moreover, the press release forecasted a 2.5% to 4% increase in sales over March and April 2007. The press release stated in relevant part:

> Federated Department Stores, Inc. today reported total sales of $1.802 billion for the four weeks ended March 3, 2007, essentially flat compared to total sales of $1.800 billion in the same period last year. On a same-store basis, Federated's sales for February were up 1.2 percent. This compares with the company's guidance for a same-store sales increase of 2 percent to 3 percent in February.
>
> "Sales in February were impacted by a series of *snow and ice storms* in the eastern half of the U.S., including those during the important selling days immediately preceding Valentine's Day. The geographic region that was most affected by adverse weather was the Upper Midwest," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "Aside from the weather, we were pleased with performance of both the new and legacy Macy's stores."
>
> Federated expects same-store sales in both March and April *to increase by 2.5 percent to 4 percent*.
>
> Beginning in February and now ongoing, Federated's same-store sales include former May Company locations, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year.

82.     On April 4, 2007, the Individual Defendants caused or allowed the Company to issue a press release titled "Federated Invests for Continued Growth in Direct-to-Consumer Businesses." The press release forecasted rapid sales growth including more than a billion in sales by 2008. The press release stated in relevant part:

> Federated Department Stores, Inc. today announced an additional capital investment of approximately $100 million in 2007-2008 to support continued growth in its direct-to-consumer businesses, including macys.com, bloomingdales.com, Bloomingdale's By Mail, macysweddingchannel.com and bloomingdales wedding channel.com. The amount is incorporated in Federated's total capital spending plans, which include $1.2 billion in 2007 and $1.1 billion in 2008.

- 33 -

"Our online sales *continue to grow at a rapid pace* as the national expansion of Federated and Bloomingdale's attracts new customers to our stores, Web sites and catalog," said Terry J. Lundgren, Federated's chairman, president and chief executive officer.  "In particular, we are seeing exceptional growth in online sales in new Macy's markets such as Illinois, Michigan, Minnesota, Missouri, Oklahoma, Texas and Utah.

"Currently, we anticipate our direct-to-consumer businesses will grow to *more than $1 billion in sales by 2008 from about $620 million in 2006*," he said. "Supporting this pace of growth requires additional investment so we can scale up the volume of business while enhancing customer service, delivery efficiency and online site functionality."

New investments will include the building of a 600,000-square-foot distribution center in Goodyear, AZ, which will serve primarily as the West Coast shipping point for macys.com. Construction on this facility will begin in spring 2007 and is scheduled for completion in spring 2008. The facility will employ more than 500 full-time associates when completed and fully operational. The Goodyear distribution center is designed to accommodate a future expansion of 400,000 square feet.

Also included in the 2007-2008 capital plan are an expansion of the direct-to-consumer warehouse management system, improvements to the order management system and enhancements to the macys.com Web site to support projected increases in customer traffic.

83.     On April 12, 2007, the Individual Defendants caused or allowed the Company to issue a press release titled "Federated's March Same-Store Sales up 2.3%."  The press release announced the Company's sales for March 2007, which fell short of expectations.  The press release attributed the sales miss to weakness in home-related merchandise categories.  The release stated in relevant part:

Federated Department Stores, Inc. today reported total sales of $2.288 billion for the five weeks ended April 7, 2007, an increase of 1.5 percent compared to total sales of $2.255 billion in the same period last year. On a same-store basis, Federated's sales for March were up 2.3 percent. This compares with the company's guidance for a same-store sales increase of 2.5 percent to 4 percent in March.

For the year to date, Federated's sales totaled $4.089 billion, up 0.8 percent from total sales of $4.055 billion in the first nine weeks of 2006. On a same-store basis, Federated's year-to-date sales were up 1.8 percent.

"March sales fell just short of our expectations in most regions across the country, largely *attributable to weakness in home-related merchandise categories*," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "Unseasonably cold weather as new spring merchandise flowed into the stores in the pre-Easter period also contributed to disappointing sales in the month."

Federated continues to expect same-store sales in April to increase by 2.5 percent to 4 percent. Sales in the first quarter are expected to be at the low end of previous guidance of $6 billion to $6.1 billion.

## DISAPPOINTING APRIL SALES

84.    On May 10, 2007, Macy's shareholders and the market learned that sales did not increase for April 2007 as the Company's prior statements had forecasted. In fact, the Company's April same-store sales were down 2.2%. Defendant Lundgren blamed the loss of sales on a shifted promotional event. Specifically, Lundgren stated that "'April sales were disappointing across the country in both new and legacy Macy's stores'" and that a "'***major promotional event*** that was shifted from May last year to April this year did not produce the results we expected.'" A Macy's press release issued on May 10 stated that the Company expected same-store sales in May 2007 "to be in the range of flat to down 2 percent, which reflects ***the promotional event shift*** from May into April."

## THE TRUTH IS REVEALED

85.    On May 16, 2007, Macy's issued a press release announcing disappointing financial results for the first fiscal quarter of 2007. Despite the improper statements' forecasts of increased momentum and sales, defendant Lundgren stated that "sales in the new Macy's locations were disappointing in the quarter ...." The press release further disclosed that: (i) customers of the former May stores had rejected the rapid conversion; (ii) sales at the Company's new Macy's stores had declined during the first quarter; and (iii) in particular, the Company's decision to dramatically cut the number of days coupons could be used at the former May locations had badly damaged sales.

86.    First quarter 2007 revenue significantly missed the Company's earlier forecast of $6.1 billion, coming in 2% lower at $5.92 billion. Sales at stores open at least a year rose only 0.6%, missing the Company's guidance of a 2.5% to 3.5% gain. Meanwhile, same-store sales rose 2.2% at J.C. Penney, 4.3% at Target and 9.5% at Nordstroms. The Company lowered its second quarter 2007 sales forecast from $6.2 to $6.1 billion and its profit forecast from $0.40-$0.45 per share to $0.35-$0.45 per share.

87.    On this news, Macy's stock price plunged to a price over 38% lower than its Relevant Period high of $46.51 per share on March 23, 2007, erasing over $3 billion in market capitalization.

## REASONS THE STATEMENTS WERE IMPROPER

88.     Macy's Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

      (a)     The integration of the former May's stores would result in lower sales and thus lower profits;

      (b)     Macy's forecasted sales and earnings were grossly inaccurate; and

      (c)     Macy's fiscal first quarter 2007 results would not meet the expectations of analysts, investors and shareholders.

## DAMAGES TO THE COMPANY

89.     As a result of the Individual Defendants' wrongdoing, Macy's disseminated improper statements concerning its business prospects as alleged above.

90.     As a direct and proximate result of the Individual Defendants' improper actions as alleged above, Macy's market capitalization has been damaged by over $3 billion. At the same time that the Individual Defendants were causing Macy's to suffer such devastation of its market capitalization, however, the Insider Selling Defendants were profiting by selling over $53 million of their personally held stock.

91.     Further, as a direct and proximate result of Individual Defendants' actions, Macy's has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

      (a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

      (b)     Costs incurred as a result of securities class actions filed against the Company by investors, who lost billions as a result of being mislead by the improper statements;

      (c)     Over $2 billion spent to repurchase Macy's shares at artificially inflated prices; and

      (d)     Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to Macy's.

92.    Moreover, these actions have irreparably damaged Macy's corporate image and goodwill. For at least the foreseeable future, Macy's will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Macy's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## LOSS CAUSATION/ECONOMIC HARM

93.    During the Relevant Period, as detailed herein, the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Macy's stock price and operated as a fraud or deceit on Relevant Period purchasers of Macy's stock, including the Company, by misrepresenting the Company's business success and future business prospects. When the Individual Defendants' falsehoods, misrepresentations and omissions were disclosed and became apparent, Macy's stock price fell precipitously as some of the prior artificial inflation came out of the stock. As a result, purchasers of Macy's stock during the Relevant Period, including the Company, which repurchased $2 billion worth of its own stock on the open market, suffered economic loss, *i.e.*, damages, under the federal securities laws.

94.    The Individual Defendants' false and misleading statements and omissions had the intended effect and caused Macy's stock to trade at artificially inflated levels throughout the Relevant Period, reaching a Relevant Period high of $46.51 per share on March 23, 2007, before collapsing to $28.83 per share on September 12, 2007 – a 38% decline.

95.    The 39% decline in Macy's stock price at the end of the Relevant Period was a direct result of the nature and extent of the Individual Defendants' fraud being partially revealed to investors and the market. The timing and magnitude of Macy's stock price decline negates any inference that the loss suffered by the Company was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Individual Defendants' fraudulent conduct. Indeed, while Macy's stock price fell 39% as a result of uncovering the Individual Defendants' fraud, the Standard & Poor's 500 securities index was essentially flat. The economic loss, *i.e.*, damages, suffered by the Company, including the significant decline in the value of Macy's stock after the Individual Defendants' misrepresentations and other fraudulent

conduct was revealed, was a direct result of the Individual Defendants' wrongful scheme to artificially inflate Macy's stock price.

## ILLEGAL INSIDER SELLING

96.    While in possession of the undisclosed material adverse information relating to the failing May stores integration, the Insider Selling Defendants sold the following shares of their Macy's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BELSKY | 3/21/2007 | 10,000 | $46.15 | $461,500.00 |
|  |  | **10,000** |  | **$461,500.00** |
|  |  |  |  |  |
| BRODERICK | 3/2/2007 | 4,600 | $44.28 | $203,688.00 |
| BRODERICK | 3/2/2007 | 24,000 | $44.29 | $1,062,960.00 |
| BRODERICK | 3/27/2007 | 10,000 | $46.23 | $462,300.00 |
| BRODERICK | 3/27/2007 | 4,400 | $46.24 | $203,456.00 |
| BRODERICK | 3/27/2007 | 11,400 | $46.25 | $527,250.00 |
| BRODERICK | 3/27/2007 | 4,200 | $46.26 | $194,292.00 |
| BRODERICK | 3/27/2007 | 1,400 | $46.29 | $64,806.00 |
| BRODERICK | 3/27/2007 | 2,600 | $46.30 | $120,380.00 |
| BRODERICK | 3/27/2007 | 1,200 | $46.33 | $55,596.00 |
| BRODERICK | 3/30/2007 | 4,600 | $45.50 | $209,300.00 |
|  |  | **68,400** |  | **$3,104,028.00** |
|  |  |  |  |  |
| CODY | 3/2/2007 | 120,000 | $44.42 | $5,330,400.00 |
| CODY | 3/29/2007 | 900 | $44.89 | $40,401.00 |
| CODY | 3/29/2007 | 3,100 | $44.90 | $139,190.00 |
| CODY | 3/29/2007 | 300 | $44.91 | $13,473.00 |
| CODY | 3/29/2007 | 700 | $44.92 | $31,444.00 |
| CODY | 3/29/2007 | 2,100 | $44.94 | $94,374.00 |
| CODY | 3/29/2007 | 1,900 | $44.95 | $85,405.00 |
| CODY | 3/29/2007 | 1,000 | $44.96 | $44,960.00 |
| CODY | 3/29/2007 | 1,000 | $44.97 | $44,970.00 |
| CODY | 3/29/2007 | 1,000 | $44.99 | $44,990.00 |
| CODY | 3/29/2007 | 1,000 | $45.00 | $45,000.00 |
| CODY | 3/29/2007 | 2,100 | $45.01 | $94,521.00 |
| CODY | 3/29/2007 | 3,200 | $45.02 | $144,064.00 |
| CODY | 3/29/2007 | 3,900 | $45.03 | $175,617.00 |
| CODY | 3/29/2007 | 2,100 | $45.04 | $94,584.00 |
| CODY | 3/29/2007 | 4,300 | $45.05 | $193,715.00 |
| CODY | 3/29/2007 | 5,100 | $45.06 | $229,806.00 |
| CODY | 3/29/2007 | 300 | $45.07 | $13,521.00 |
| CODY | 3/29/2007 | 10,800 | $45.10 | $487,080.00 |
| CODY | 3/29/2007 | 2,500 | $45.11 | $112,775.00 |
| CODY | 3/29/2007 | 8,400 | $45.12 | $379,008.00 |
| CODY | 3/29/2007 | 1,700 | $45.13 | $76,721.00 |

| | | | | |
|---|---|---|---|---|
| CODY | 3/29/2007 | 600 | $45.14 | $27,084.00 |
| CODY | 3/29/2007 | 5,800 | $45.15 | $261,870.00 |
| CODY | 3/29/2007 | 1,200 | $45.16 | $54,192.00 |
| | | 185,000 | | $8,259,165.00 |
| | | | | |
| COLE | 3/26/2007 | 13,800 | $46.30 | $638,940.00 |
| COLE | 3/26/2007 | 11,600 | $46.31 | $537,196.00 |
| COLE | 3/26/2007 | 14,400 | $46.32 | $667,008.00 |
| COLE | 3/26/2007 | 36,400 | $46.33 | $1,686,412.00 |
| COLE | 3/26/2007 | 12,300 | $46.34 | $569,982.00 |
| COLE | 3/26/2007 | 13,600 | $46.35 | $630,360.00 |
| COLE | 3/26/2007 | 17,100 | $46.36 | $792,756.00 |
| COLE | 3/26/2007 | 2,100 | $46.37 | $97,377.00 |
| COLE | 3/26/2007 | 700 | $46.38 | $32,466.00 |
| COLE | 3/26/2007 | 1,000 | $46.39 | $46,390.00 |
| COLE | 3/26/2007 | 2,000 | $46.40 | $92,800.00 |
| COLE | 3/26/2007 | 3,700 | $46.41 | $171,717.00 |
| COLE | 3/26/2007 | 2,500 | $46.42 | $116,050.00 |
| COLE | 3/26/2007 | 5,800 | $46.43 | $269,294.00 |
| COLE | 3/26/2007 | 1,900 | $46.45 | $88,255.00 |
| COLE | 3/26/2007 | 1,500 | $46.46 | $69,690.00 |
| COLE | 3/26/2007 | 1,600 | $46.47 | $74,352.00 |
| COLE | 3/26/2007 | 2,000 | $46.48 | $92,960.00 |
| COLE | 3/28/2007 | 8,950 | $45.33 | $405,703.50 |
| COLE | 3/28/2007 | 1,000 | $45.64 | $45,640.00 |
| COLE | 3/28/2007 | 900 | $45.69 | $41,121.00 |
| COLE | 3/28/2007 | 7,100 | $45.70 | $324,470.00 |
| COLE | 3/28/2007 | 2,300 | $45.71 | $105,133.00 |
| COLE | 3/28/2007 | 1,400 | $45.72 | $64,008.00 |
| COLE | 3/28/2007 | 900 | $45.73 | $41,157.00 |
| COLE | 3/28/2007 | 1,900 | $45.74 | $86,906.00 |
| COLE | 3/28/2007 | 6,400 | $45.75 | $292,800.00 |
| COLE | 3/28/2007 | 5,200 | $45.76 | $237,952.00 |
| COLE | 3/28/2007 | 100 | $45.77 | $4,577.00 |
| COLE | 3/28/2007 | 500 | $45.78 | $22,890.00 |
| COLE | 3/28/2007 | 500 | $45.79 | $22,895.00 |
| COLE | 3/28/2007 | 1,300 | $45.80 | $59,540.00 |
| COLE | 3/28/2007 | 800 | $45.81 | $36,648.00 |
| COLE | 3/28/2007 | 700 | $45.82 | $32,074.00 |
| COLE | 3/28/2007 | 1,500 | $45.86 | $68,790.00 |
| | | 185,450 | | $8,566,309.50 |
| | | | | |
| GROVE | 3/2/2007 | 42,000 | $44.31 | $1,861,020.00 |
| GROVE | 3/2/2007 | 30,000 | $44.31 | $1,329,300.00 |
| GROVE | 3/26/2007 | 239 | $46.28 | $11,060.92 |
| GROVE | 4/17/2007 | 3,000 | $45.14 | $135,420.00 |
| GROVE | 4/17/2007 | 4,500 | $45.15 | $203,175.00 |
| GROVE | 4/17/2007 | 1,500 | $45.16 | $67,740.00 |
| GROVE | 4/17/2007 | 1,000 | $45.19 | $45,190.00 |
| GROVE | 4/17/2007 | 2,900 | $45.20 | $131,080.00 |
| GROVE | 4/17/2007 | 2,500 | $45.21 | $113,025.00 |

| | | | | |
|---|---|---|---|---|
| GROVE | 4/17/2007 | 4,200 | $45.22 | $189,924.00 |
| GROVE | 4/17/2007 | 8,900 | $45.23 | $402,547.00 |
| GROVE | 4/17/2007 | 3,500 | $45.24 | $158,340.00 |
| GROVE | 4/17/2007 | 300 | $45.26 | $13,578.00 |
| GROVE | 4/17/2007 | 3,100 | $45.27 | $140,337.00 |
| GROVE | 4/17/2007 | 1,900 | $45.28 | $86,032.00 |
| GROVE | 4/17/2007 | 6,100 | $45.29 | $276,269.00 |
| GROVE | 4/17/2007 | 4,300 | $45.30 | $194,790.00 |
| GROVE | 4/17/2007 | 3,200 | $45.31 | $144,992.00 |
| GROVE | 4/17/2007 | 15,800 | $45.32 | $716,056.00 |
| GROVE | 4/17/2007 | 12,500 | $45.33 | $566,625.00 |
| GROVE | 4/17/2007 | 14,700 | $45.34 | $666,498.00 |
| GROVE | 4/17/2007 | 10,200 | $45.35 | $462,570.00 |
| GROVE | 4/17/2007 | 5,500 | $45.36 | $249,480.00 |
| GROVE | 4/17/2007 | 12,700 | $45.37 | $576,199.00 |
| GROVE | 4/17/2007 | 3,600 | $45.38 | $163,368.00 |
| GROVE | 4/17/2007 | 600 | $45.39 | $27,234.00 |
| GROVE | 4/17/2007 | 3,500 | $45.40 | $158,900.00 |
| GROVE | 4/18/2007 | 523 | $44.95 | $23,508.85 |
| | | **202,762** | | **$9,114,258.77** |
| | | | | |
| HOGUET | 3/2/2007 | 84,000 | $44.37 | $3,727,080.00 |
| | | **84,000** | | **$3,727,080.00** |
| | | | | |
| KRONICK | 3/9/2007 | 53,800 | $44.50 | $2,394,100.00 |
| KRONICK | 3/12/2007 | 60,700 | $44.50 | $2,701,150.00 |
| | | **114,500** | | **$5,095,250.00** |
| | | | | |
| LEVINSON | 3/21/2007 | 3,500 | $45.80 | $160,300.00 |
| LEVINSON | 4/9/2007 | 3,500 | $46.01 | $161,035.00 |
| | | **7,000** | | **$321,335.00** |
| | | | | |
| LUNDGREN | 2/28/2007 | 45,580 | $44.48 | $2,027,398.40 |
| LUNDGREN | 3/22/2007 | 22,600 | $46.00 | $1,039,600.00 |
| LUNDGREN | 3/22/2007 | 5,000 | $46.00 | $230,000.00 |
| LUNDGREN | 3/22/2007 | 37,300 | $46.01 | $1,716,173.00 |
| LUNDGREN | 3/22/2007 | 3,100 | $46.01 | $142,631.00 |
| LUNDGREN | 3/22/2007 | 4,600 | $46.02 | $211,692.00 |
| LUNDGREN | 3/22/2007 | 2,200 | $46.03 | $101,266.00 |
| LUNDGREN | 3/22/2007 | 2,100 | $46.03 | $96,663.00 |
| LUNDGREN | 3/22/2007 | 6,100 | $46.04 | $280,844.00 |
| LUNDGREN | 3/22/2007 | 2,600 | $46.04 | $119,704.00 |
| LUNDGREN | 3/22/2007 | 23,200 | $46.05 | $1,068,360.00 |
| LUNDGREN | 3/22/2007 | 6,820 | $46.05 | $314,061.00 |
| LUNDGREN | 3/22/2007 | 7,300 | $46.06 | $336,238.00 |
| LUNDGREN | 3/22/2007 | 4,600 | $46.06 | $211,876.00 |
| LUNDGREN | 3/22/2007 | 11,200 | $46.07 | $515,984.00 |
| LUNDGREN | 3/22/2007 | 5,600 | $46.07 | $257,992.00 |
| LUNDGREN | 3/22/2007 | 5,400 | $46.08 | $248,832.00 |
| LUNDGREN | 3/22/2007 | 100 | $46.08 | $4,608.00 |
| LUNDGREN | 3/22/2007 | 6,600 | $46.09 | $304,194.00 |

| | | | | |
|---|---|---|---|---|
| LUNDGREN | 3/22/2007 | 8,400 | $46.10 | $387,240.00 |
| LUNDGREN | 3/22/2007 | 4,400 | $46.10 | $202,840.00 |
| LUNDGREN | 3/22/2007 | 12,100 | $46.11 | $557,931.00 |
| LUNDGREN | 3/22/2007 | 1,400 | $46.11 | $64,554.00 |
| LUNDGREN | 3/22/2007 | 5,700 | $46.12 | $262,884.00 |
| LUNDGREN | 3/22/2007 | 800 | $46.12 | $36,896.00 |
| LUNDGREN | 3/22/2007 | 6,000 | $46.13 | $276,780.00 |
| LUNDGREN | 3/22/2007 | 200 | $46.13 | $9,226.00 |
| LUNDGREN | 3/22/2007 | 8,400 | $46.14 | $387,576.00 |
| LUNDGREN | 3/22/2007 | 10,200 | $46.15 | $470,730.00 |
| LUNDGREN | 3/22/2007 | 4,300 | $46.16 | $198,488.00 |
| LUNDGREN | 3/22/2007 | 1,200 | $46.17 | $55,404.00 |
| LUNDGREN | 3/22/2007 | 3,800 | $46.18 | $175,484.00 |
| LUNDGREN | 3/22/2007 | 9,200 | $46.20 | $425,040.00 |
| LUNDGREN | 3/22/2007 | 3,800 | $46.21 | $175,598.00 |
| LUNDGREN | 3/22/2007 | 7,000 | $46.22 | $323,540.00 |
| LUNDGREN | 3/22/2007 | 900 | $46.23 | $41,607.00 |
| LUNDGREN | 3/22/2007 | 1,000 | $46.24 | $46,240.00 |
| LUNDGREN | 3/22/2007 | 1,200 | $46.25 | $55,500.00 |
| LUNDGREN | 3/22/2007 | 1,800 | $46.26 | $83,268.00 |
| LUNDGREN | 3/22/2007 | 8,700 | $46.30 | $402,810.00 |
| LUNDGREN | 3/22/2007 | 4,100 | $46.31 | $189,871.00 |
| LUNDGREN | 3/22/2007 | 2,400 | $46.32 | $111,168.00 |
| LUNDGREN | 3/22/2007 | 1,300 | $46.33 | $60,229.00 |
| LUNDGREN | 3/22/2007 | 1,900 | $46.34 | $88,046.00 |
| LUNDGREN | 3/22/2007 | 1,300 | $46.35 | $60,255.00 |
| LUNDGREN | 3/22/2007 | 9,400 | $46.36 | $435,784.00 |
| LUNDGREN | 3/22/2007 | 2,100 | $46.37 | $97,377.00 |
| | | 325,000 | | $14,910,482.40 |
| | | | | |
| WEATHERUP | 3/15/2007 | 2,000 | $44.30 | $88,600.00 |
| WEATHERUP | 3/15/2007 | 1,700 | $44.32 | $75,344.00 |
| WEATHERUP | 3/15/2007 | 300 | $44.33 | $13,299.00 |
| WEATHERUP | 3/15/2007 | 2,000 | $44.38 | $88,760.00 |
| WEATHERUP | 3/15/2007 | 1,000 | $44.39 | $44,390.00 |
| | | 7,000 | | $310,393.00 |
| | | | | |
| TOTAL: | | 1,189,112 | | $53,869,801.67 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.    Plaintiff brings this action derivatively in the right and for the benefit of Macy's to redress injuries suffered, and to be suffered, by Macy's as a direct result of the breaches of fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Macy's is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

98.    Plaintiff will adequately and fairly represent the interests of Macy's in enforcing and prosecuting its rights.

99.    Plaintiff is and was an owner of the stock of Macy's during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

100.    Macy's Board consisted of the following nine individuals when this action was filed: defendants Lundgren, Neubauer, Roche, Whittington, Pichler, Feldberg, von der Heyden, Levinson and Weatherup.[2] Plaintiff did not make any demand on Macy's Board to institute this action because such a demand would have been a futile, wasteful and useless act.

101.    Each of the Individual Defendants knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information regarding the improper accounting as a result of their access to and review of internal corporate documents, attendance at Board meetings, and conversations and connections with other corporate officers, employees and directors.  However, the following current members of the Macy's Board participated in the illegal insider selling:

(a)    Defendant Lundgren sold 325,000 of his personally held shares for $14,910,482.40 in proceeds while in possession of material, non-public information;

(b)    Defendant Levinson sold 7,000 of her personally held shares for $321,335 in proceeds while in possession of material, non-public information; and

(c)    Defendant Weatherup sold 7,000 of his personally held shares for $310,393 in proceeds while in possession of material, non-public information.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.  Also, these defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties for insider selling.  Because the defendants have breached their fiduciary duties and are interested, any demand upon them would have been futile.

---

[2]  Since this action was originally filed, non-defendant Stephen F. Bollenbach joined the Board.

102.    According to the Company's most recent Proxy Statement, the Director Defendants own the following unexercisable stock options:  Lundgren, 852,352; Hoguet, 226,220; Levinson, 25,000; Weatherup, 25,000; Neubauer, 25,000; Pichler, 25,000; Roche, 10,000; Feldberg, 25,000; Whittington, 25,000; von der Heyden, 25,000; Stiritz, 11,248; Cody, 152,720; Cole, 302,720; Grove, 302,720; Kronick, 352,720.  Pursuant to the Company's 1995 Executive Equity Incentive Plan (As Amended and Restated as of May 19, 2006), which covers grants to both employee and non-employee directors, "[e]ach grant will specify the period or periods of continuous service by the Optionee with the Company or any Subsidiary which is necessary before the Option Rights or installments thereof will become exercisable . . . "  Because these unexercisable options are worth potentially hundreds of thousands of dollars and more and thus are a material benefit to these directors and their vesting in conditioned on their continued service with the Company, these directors would not institute this action as to do so would jeopardize this material benefit.

103.    The members of Macy's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, as detailed herein, and therefore, they are not able to and will not vigorously prosecute any such action.  These prejudicial entanglements include, *inter alia*:

(a)    Defendant Lundgren is a Trustee of Carnegie Hall, and defendant Weatherup served as a Trustee of Carnegie Hall with Lundgren until 2003.  Additionally, according to Carnegie Hall's Annual Report 2005-2006, Macy's donated/contributed between $30,000 and $49,999 to Carnegie Hall.  According to that same report, defendant von der Heyden donated between $15,000 and $19,999 to Carnegie Hall.  Additionally, according to Carnegie Hall's 2005-2006 Annual Report, Verizon Communications, on whose board of directors defendant Neubauer serves, donated between $50,000 and $99,999, and Morgan Stanley & Co. donated between $30,000 and $49,999 and UBS donated between $12,000 and $19,999 to Carnegie Hall.  Defendant Feldberg serves as a senior advisor to Morgan Stanley & Co. and sits on the board of directors of UBS.  Moreover, according to

Carnegie Hall's Annual Report for 2005-2006, defendant Weatherup donated between $250,000 and $499,999 to the Andrew Carnegie Society, the Federated Department Stores Foundation donated between $500,000 and $999,999 to the Andrew Carnegie Society, the Verizon Foundation donated between $1 million and $2,499,999, and Morgan Stanley & Co. donated between $100,000 and $249,999;

      (b)    Defendant Weatherup previously served as Chairman and CEO of the Pepsi Bottling Group from 1999 to 2003. During that time, defendant Kronick served as a member of the board of the Pepsi Bottling Group;

      (c)    Defendant Neubauer is a member of the board of directors of Verizon Communications, Inc., from whom Macy's purchases it telecommunications network management services;

      (d)    Defendant Neubauer is currently Chairman and CEO of Aramark and has been since 1984 and 1983, respectively; defendant von der Heyden also served as a member of the board of directors of Aramark from 2001-2007 with Neubauer;

      (e)    Both defendants Pichler and Neubauer received their MBA's from the University of Chicago. Pichler received his MBA in 1963, and Neubauer received his in 1965;

      (f)    Defendant Neubauer is a Trustee for the University of Chicago, which received at least $50,000 from Morgan Stanley & Co., for which defendant Feldberg serves as a Senior Advisor;

      (g)    Prior to acquisition of May by Macy's, defendants Roche and Stiritz served together on May's board of directors. Additionally, while on May's board of directors, Roche and Stiritz served on the Nominating and Corporate Governance Committee together;

      (h)    Defendant Feldberg has been a Senior Advisor to Morgan Stanley & Co. since 2005. Morgan Stanley & Co. acted as financial advisor to May's board of directors in connection with the Merger between Macy's and May;

      (i)    Macy's is sponsor of the Meyer Feldberg Distinguished Fellowship program at the University of Columbia, from which defendant Feldberg received his PhD in Management and Strategy in 1965; and

(j)    Defendant Lundgren is the namesake of the Terry Lundgren Center for Retailing at the University of Arizona, which is Lundgren's alma mater. Macy's has served on the corporate advisory board for the Center for Retailing.

104.    Defendants Neubauer, Roche, Whittington and von der Heyden were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter charges the Audit Committee with reviewing and discussing: (i) the Company's earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies; and (ii) the Company's disclosure and internal controls. Thus, the Audit Committee was responsible for overseeing and directly participating in Macy's financial reporting process. Accordingly, defendants Neubauer, Roche, von der Heyden and Whittington breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of improper statements and earnings press releases that contained false and/or misleading material information. Particularly, these defendants reviewed and failed to correct Macy's improper earnings press releases and interim and annual financial statements described above. Moreover, Roche, as a former May director and member of May's Audit Committee, had special access to May's financial results and business condition prior to its merger with Macy's, and therefore, knew or had reason to know of May's history of declining sales and the likelihood that this decline would continue after consummation of the merger and affect the May stores integration. Thus, Neubauer, Roche, Whittington and von der Heyden face a sufficiently substantial likelihood of liability for their breach of fiduciary duties any demand upon them would have been futile.

105.    Defendants Lundgren, Neubauer, Roche, Whittington, Pichler, Feldberg, von der Heyden, Levinson and Weatherup as members of the Board during the Relevant Period authorized the buyback of over $2 billion of the Company's shares at artificially inflated prices. The Board's decision to authorize the share buybacks was not the product of valid business judgment. Further, defendants engaged in self-dealing in that they sold their personally held shares while directing the Company to buyback shares. Accordingly, demand would have been futile.

106.    The principal professional occupation of Lundgren is his employment with Macy's, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, Lundgren was paid the following compensation at times relevant hereto:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-Qualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $1,383,333 | $6,651,653 | $3,464,675 | $2,704,800 | $1,199,550 | $243,106 |

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Options Grants – Securities Underlying Options Granted | All Other Compensation |
|---|---|---|---|---|---|
| 2005 | $1,292,500 | $2,077,900 | $119,192 | 275,000 | $9,921 |

Accordingly, Lundgren lacks independence from Pichler, Neubauer, Feldberg, von der Heyden, Levinson and Weatherup, defendants who are not disinterested and/or independent and who exert influence over Lundgren's compensation by virtue of their positions on the Compensation and Management Development Committee.  The Compensation and Management Development Committee has the authority to review and approve Lundgren's base salary, bonus and equity compensation.  This lack of independence rendered defendant Lundgren incapable of impartially considering a demand to commence and vigorously prosecute this action.

107.    Because the members of the Compensation and Management Development Committee singularly control the other defendants' awards, the remaining members of the Board would not institute this action against defendants Pichler, Neubauer, Feldberg, von der Heyden, Levinson and Weatherup.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants Lundgren, Roche and Whittington would have been futile.

108.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

109.    The Director Defendants of Macy's, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Macy's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

110.    In order to bring this suit, all of the directors of Macy's would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

111.    The acts complained of constitute violations of the fiduciary duties owed by Macy's officers and directors and these acts are incapable of ratification.

112.    Each of the Director Defendants of Macy's authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

113.    Any suit by the Board to remedy these wrongs would likely expose the Individual Defendants and Macy's to violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.  Indeed, both defendants Hoguet and Lundgren are named in the securities fraud class action pending in this District and thus, are conflicted.

114.    Macy's has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Macy's any part of the damages Macy's suffered and will suffer thereby.

115.    If Macy's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Macy's. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Macy's

against these defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Macy's, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all, then the current directors will not cause Macy's to sue them, because they will face a large uninsured liability.

116.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Board has failed and refused to seek to recover for Macy's for any of the wrongdoing alleged by plaintiff herein.

117.    Plaintiff did not make any demand on shareholders of Macy's to institute this action since such demand would have been a futile and useless act for the following reasons:

(a)    Macy's is a publicly held company with over 459 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

### COUNT I

### Against All Defendants for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    During the Relevant Period, the Individual Defendants disseminated or approved the improper statements alleged above that failed to accurately disclose Macy's true business prospects. Specifically, Macy's Relevant Period statements, among other things, failed to disclose that the Company's sales were declining as a result of the failed integration of the May department stores. The Individual Defendants knew or recklessly disregarded the fact that the Company's Relevant Period statements were misleading in that the financial statements contained misrepresentations and

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

120.    The Insider Selling Defendants also sold over 1,189,112 shares of Macy's common stock at inflated prices during the Relevant Period, receiving over $53 million in proceeds, while in possession of material non-public information.    These defendants misappropriated Macy's proprietary information and violated their "abstain or disclose" duties under the federal securities laws when they sold Macy's stock without disclosing the information alleged to have been concealed herein.

121.    At the same time the price of the Company's common stock was inflated due to the improperly accounted for stock options and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing Macy's to repurchase $2 billion worth of its own stock on the open market at inflated prices.

122.    As such, the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Macy's and others in connection with their purchases of Macy's common stock during the Relevant Period.

123.    As a result of the Individual Defendants' misconduct, Macy's has and will suffer damages in that it paid artificially inflated prices for Macy's common stock purchased on the open market. Macy's would not have purchased Macy's common stock at the prices it paid had the market previously been aware that the market price of Macy's stock was artificially and falsely inflated by the Individual Defendants' misleading statements.    As a direct and proximate result of these defendants' wrongful conduct, Macy's suffered damages in connection with its purchases of Macy's common stock during the Relevant Period. By reason of such conduct, the Individual Defendants

are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

**Against All Defendants for Breach of Fiduciary Duty for Improper Financial Reporting**

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    The Individual Defendants owed and owe Macy's fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Macy's the highest obligation of good faith, fair dealing, loyalty and due care.

126.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

127.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Macy's has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

129.    Plaintiff on behalf of Macy's has no adequate remedy at law.

## COUNT III

**Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Macy's common stock on the basis of such information.

132.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Macy's common stock.

133.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Macy's common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

134.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

**Against All Defendants for Breach of Fiduciary Duty for Abuse of Control**

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Macy's, for which they are legally responsible.

137.    As a direct and proximate result of the Individual Defendants' abuse of control, Macy's has sustained significant damages.

138.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

139.    Plaintiff on behalf of Macy's has no adequate remedy at law.

## COUNT V

**Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement**

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Macy's in a manner consistent with the operations of a publicly held corporation.

142.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Macy's has sustained significant damages in excess of hundreds of millions of dollars.

143.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

144.    Plaintiff on behalf of Macy's has no adequate remedy at law.

**COUNT VI**

**Against All Defendants for Waste of Corporate Assets**

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Macy's to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

147.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

148.    Plaintiff on behalf of Macy's has no adequate remedy at law.

**COUNT VII**

**Against All Defendants for Unjust Enrichment**

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Macy's.

151.    Plaintiff, as a shareholder and representative of Macy's, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and

other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for directing Macy's to repurchase $2 billion of its stock at artificially inflated prices and awarding Macy's damages;

C.    Directing Macy's to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Macy's and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    control and limit insider stock selling;

3.    a provision to permit the shareholders of Macy's to nominate at least three candidates for election to the Board;

4.    a proposal to ensure the accuracy of the qualifications of Macy's directors, executives and other employees;

5.    a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters;

6.    a proposal to hire truly independent financial advisors to determine if potential share repurchases are in the Company's best interest; and

7.    appropriately test and then strengthen the internal audit and control functions.

D.    Extraordinary equitable and/or injunctive relief as permitted by law and equity including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Macy's has an effective remedy;

E.    Awarding to Macy's restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  October 8, 2007

LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON


*s/ Thomas G. Amon*
THOMAS G. AMON

500 Fifth Avenue, Suite 1650
New York, NY 10110
Telephone: (212) 810-2431
Facsimile:  (212) 810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
CAROLINE A. SCHNURER
ASHLEY R. PALMER
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

BARRETT, JOHNSTON & PARSLEY, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.

TIMOTHY L. MILES
217 Second Avenue North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile:  (615) 252-3798

Attorneys for Plaintiff

286511_3.DOC

## VERIFICATION

I, Earl Seymour, hereby declare as follows:

I am Chairman of the Board of Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("Pirelli"). Pirelli is a shareholder of Macy's Inc. (formerly known as Federated Department Stores, Inc.) and has been during the relevant times pertinent hereto. I certify under penalty of perjury that I have reviewed the foregoing First Amended Verified Shareholder Derivative Complaint ("Amended Complaint"), and authorized its filing and, based upon the investigation of my counsel, that the contents in the Amended Complaint are true to the best of my knowledge, information and belief.

Dated: October 5, 2007

_____
EARL SEYMOUR
Chairman of the Board
Pirelli Armstrong Tire Corporation Retiree
Medical Benefits Trust

## CERTIFICATE OF SERVICE

I hereby certify a true and exact copy of the foregoing has been served on all Filing Users through the Court's Electronic Filing System on October 8, 2007.

_/s/ Thomas G. Amon_____
Thomas G. Amon