UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

PIRELLI ARMSTRONG TIRE CORPORATION  :      07 Civ. 5862 (RJH)
RETIREE MEDICAL BENEFITS TRUST,     :
derivatively on behalf of MACY'S INC.,    :
                        :
            Plaintiff,   :
                        :
      -against-       :    **MEMORANDUM OPINION**
                        :        **AND ORDER**
TERRY J LUNDGREN, et al.,       :
                        :
          Defendants,  :
-and-                      :
                        :
MACY'S INC.,             :
                        :
       Nominal Defendant.  :
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      This is a shareholder derivative action brought by plaintiff Pirelli Armstrong Tire

Corporation Retiree Medical Benefits Trust ("Plaintiff") on behalf of nominal defendant

Macy's Inc. ("Macy's"), asserting causes of action for violations of Section 10(b) and

Rule 10b-5 of the Securities Exchange Act of 1934, various breaches of fiduciary duties,

waste of corporate assets, and unjust enrichment. The allegedly wrongful acts occurred

between August 2005 and the present. Defendants Terry J. Lundgren, Karen M. Hoguet,

Sara Levinson, Craig E. Weatherup, Joseph Neubauer, Joseph A. Pichler, Joyce M.

Roche, Meyer Feldberg, Marna C. Whittington, Karl M. von der Heyden, William P.

Stiritz Joel A. Belsky, Dennis J. Broderick, Thomas G. Cody, Thomas L. Cole, Janet E.

Grove, and Susan D. Kronick ("Defendants") are officers and/or directors of Macy's.

      Defendants have moved to dismiss the complaint for failure to satisfy the pre-suit

demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure. Defendants

also move to dismiss pursuant to Rule 12(b)(6), asserting that Plaintiff has not pled its fraud-based claims with the particularity required by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), that Plaintiff's allegations do not overcome the protection of the business judgment rule, and that Plaintiff has not pled the elements of a cause of action for waste or unjust enrichment.  For the reasons stated below, the action is dismissed for lack of a pre-suit demand.

## I.      Plaintiffs' First Amended Complaint

The following summary of Plaintiff's factual allegations is drawn from the well-pleaded allegations of Plaintiff's First Amended Verified Shareholder Derivative Complaint ("Complaint").

### A.      The Parties

Plaintiff, a shareholder of Macy's, is a citizen of Tennessee.  (¶¶ 20, 99.[1])  Macy's is incorporated in Delaware with corporate headquarters located in New York.  (¶¶ 18, 21.)  Macy's is the second largest department store franchise in the United States with more than 850 department stores in 45 states.  Macy's operates stores under the names Macy's and Bloomingdale's and also sells consumer goods over the internet.  (¶ 2.)

Defendant Lundgren is Macy's President, Chief Executive Officer, and Chairman of the Board of Directors (the "Board").  (¶ 22.)  Defendant Hoguet is Macy's Executive Vice President and Chief Financial Officer.  (¶ 23.)  Defendant Belsky is Macy's Vice President/Controller.  (¶ 33.)  Defendant Broderick is Macy's Senior Vice President, General Counsel, and Secretary.  (¶ 34.)  Defendants Cody, Cole, and Grove, and Kronick are Vice Chairs for Macy's.  (¶¶ 35–37.)  Defendants Lundgren, Levinson,

---

[1]  Citations to "¶" and "¶¶" refer to the Complaint.

Weatherup, Neubauer, Pichler, Roche, Feldberg, Whittington, von der Heyden, Stiritz (the "director-defendants") are directors of Macy's.  (¶¶ 22, 24–32.)

During the relevant period, defendants Neubauer, Roche, Whittington, von der Heyden and Stiritz served on Macy's Audit Committee (¶¶ 24–32), and defendants Weatherup, Neubaeur, Pichler, Feldberg, and von der Heyden served on Macy's Compensation and Management Development Committee (¶¶ 24–32).

### B.        Macy's Acquisition of May

In December 2004, Federated began discussing a possible business combination with May.  (¶ 3.)  May had experienced declining sales since 2003, as evidenced by statements in SEC filings from 2004 and 2005, which reported disappointing sales both in terms of number of transactions and average selling price per item.  (¶¶ 3, 62–65.)

During August 2005, after months of extensive negotiation and due diligence, Federated acquired May for $11.7 billion dollars.  (¶ 3.)  The acquisition doubled the number of Macy's stores to over 800.  (*Id.*)  On June 1, 2007, Federated changed its name to Macy's.[2]  (¶ 3.)

Before the merger, May allegedly "rel[ied] on certain of its investments, including its Bridal Group, to benefit future results."  (¶ 4.)  According to Plaintiff, the success of these investments was "May's only hope that its history of declining sales would turn around."  (¶ 65.)  Immediately after the merger, Macy's divested the May Bridal Group, claiming that "it did not fit with the company's strategy for focusing on the nationwide Macy's and Bloomingdale's brands."  (¶ 4.)

---

[2]  For convenience, the Court will refer to the post-merger entity as "Macy's."

C.      **Macy's Allegedly Misleading Statements**

Plaintiff alleges that sales in former May stores continued to lag after the merger and showed no sign of improvement.  (¶¶ 5, 51.)  But despite "declining sales growth, weak comparable store sales and two consecutive periods of double-digit percentage declines in cash flows, [Macy's] continued to raise its earnings guidance."  (¶ 67.) Between September 2005 and May 2007, defendants "caused," "directed," or "allowed" Macy's to issue statements in press releases and SEC filings touting the merger's success and predicting increased sales, earnings, and profitability (¶¶ 5–10, 47), for example:

- Macy's statements in numerous SEC filings[3] that the merger "has had" or "is expected to have a material effect on the Company's consolidated financial position, results of operations and cash flows," and to be "accretive to its earnings per share in 2007."  (*See, e.g.,* ¶¶ 69, 72, 73, 75.)

- Macy's statements in numerous SEC filings that it expected to realize $175 million and $450 million in cost savings in 2006 and 2007 respectively, from "consolidation of central functions, division integrations and the adoption of best practices across the combined company."  (¶¶ 70, 72, 73.)

- Macy's statement in an April 13, 2006 Form 10-K that "[w]ith the acquisition of May, the Company's business has grown dramatically. Accordingly, sales, number of stores and number of associates have grown and likely will continue to grow."  (¶ 71.)

- Macy's statements in SEC filings on June 6, 2006 and April 4, 2007 that the merger was "expected to accelerate . . . store sales growth."  (¶¶ 72, 75.)

- Macy's statements in SEC filings attributing increased net cash and net income in 2005 in part to the May acquisition.  (¶¶ 71, 72.)

---

[3]  All of the director-defendants signed the Forms 10-K filed during the relevant period and defendants Lundgren and Hoguet signed the Sarbanes-Oxley certifications for all Forms 10-Q and 10-K filed during this period.  (¶¶ 77, 78.)

- A February 8, 2007 press release reporting increased sales, raising Macy's earnings guidance for the fourth quarter of 2006 from $1.40 to $1.50 per share to $1.55 to $1.60 per share, reporting "continued improvement in sales trends at former May Company locations," and predicting that same-store sales would increase from 2 percent to 3 percent in February. (¶ 74.)

- A March 8, 2007 press release reporting "essentially flat" sales in February 2007 but attributing these to adverse weather and predicting a 2.5% to 4% increase in same-store sales in March and April 2007. (¶ 81.)

- An April 12, 2007 press release reporting "disappointing" sales in March 2007 but attributing these to weakness in home-related merchandise sales and unseasonably cold weather and predicting a 2.5% to 4% increase in same-store sales in April 2007. (¶ 83.)

Plaintiff alleges that these statements artificially inflated the value of Macy's stock, during a time when, in fact, the integration of the May stores was failing, sales growth was continuing to decline, and the company's sales projections were "grossly overstated." (¶¶ 4, 11, 12, 94.) Plaintiff contends that these statements were misrepresentations because the defendants knew or should have known but failed to disclose that "[t]he integration of the former May's stores would result in lower sales and thus lower profits," that "Macy's forecasted sales and earnings were grossly inaccurate," and that "Macy's fiscal first quarter 2007 results would not meet the expectations of analysts, investors and shareholders." (¶ 88.)

Plaintiff alleges that Defendants concealed adverse information regarding the merger and the company's business prospects in order to allow certain defendants to dispose of over $53 million in personally held stock, *see infra*, and to "protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof." (¶ 52.)

**D.      Macy's Reports Sales Below Expectations and Revises Forecasts**

On May 10, 2007, Macy's revealed that April 2007 same-store sales had not increased by 2.5% to 4% as forecasted, but instead had fallen by 2.2%.  (¶ 84; Platt Decl. Ex. I, Nov. 8, 2007.)  Defendant Lundgren stated that the drop in sales was due to a major promotional event that had been shifted from May to April.  (¶ 84.)  Between May 10, 2007 and May 15, 2007, Macy's allegedly disclosed that May's customers had rejected the store conversion and that Macy's sales had declined; the decline in sales was attributed to a decision to limit the use of coupons at May stores.  (¶ 13.[4])  On May 16, 2007, Macy's issued a press release that reported "disappointing" sales at the new Macy's locations for the first quarter of 2007.  (¶ 85; Platt Decl. Ex. J, Nov. 8, 2007.)

At some point, Macy's reported that its earnings for the first quarter of 2007 were $5.92 billion, 2% lower than the predicted earnings of $6.1 billion, and that sales at stores that had been open at least one year increased 0.6%, below Macy's forecast of 2.5% to 3.5%.  (¶¶ 14, 86.)  Due to these first quarter earnings figures, Macy's lowered its earnings forecast for the second quarter from $6.2 billion to $6.1 billion and its profit forecast from $0.40 to $0.45 earnings per share to $0.35 to $0.45 earnings per share. (¶¶ 15, 86.)  Following these disclosures, Macy's stock price dropped to a value 38% below its post-merger high.  (¶¶ 87, 94.)

**E.      Authorization of Stock Buyback**

Plaintiff contends that the Board damaged the company by approving on February 26, 2007 a $4 billion authorization to repurchase company shares at a time when Macy's

---

[4]  Elsewhere in the Complaint, Plaintiff alleges that these disclosures were made in a May 16, 2007 press release.  (¶ 85.)  However, a copy of a press release issued by Macy's on May 16, 2007 includes no discussion of consumers' reaction to the rapid conversion or the effects of the company's coupon policy. (Platt Decl. Ex. J, Nov. 8, 2007)

stock prices were allegedly inflated.  (¶¶ 12, 79, 91, 123.)  Following this authorization, Macy's repurchased 45 million of its own shares for approximately $2 billion, allegedly at the direction of the individual defendants.  (¶ 79)

### F.       Defendant-Directors' Stock Sales

Between February 28, 2007 and April 17, 2007, three defendant-directors (Lundgren, Levinson, and Weatherup) sold their own personal shares of Macy's stock allegedly while in possession of material, non-public information regarding Macy's financials and operations.  (¶¶ 24–38.)  Lundren sold 325,000 shares of Macy's stock for $14,910,482.40, the majority of these sales occurring on March 22, 2007; Levinson sold 7,000 shares for $321,335.00 in two sales of 3,500 shares on March 21, 2007 and April 9, 2007 and Weatherup sold 7,000 shares for $310,393.00 on March 15, 2007.  (¶ 96.)

### G.       Defendants' Alleged Knowledge of Adverse Non-Public Information

Plaintiff alleges that, based on the due diligence conducted in connection with the merger, "each member of the Board knew or should have known that May's history of declining sales would continue to plague [the company] post-merger" (¶ 65), and that May was relying on "certain investments such as its Bridal Group to overcome these difficulties" (¶ 67).

Plaintiff also alleges that defendants Neubauer, Roche, Whittington, Stiritz, and von der Heyden, as members of Macy's Audit Committee, were "responsible for reviewing and approving all of Macy's financial reporting including discussion with Macy's management the company's quarterly financial statements and annual audited financial statements and [were] responsible for requiring Macy's to accurately report its

financial results."  (¶ 26; *see also* ¶ 56.)  Plaintiff contends that these defendants had a "special duty to know and understand" that the May integration was failing and would reduce sales because "the committee is responsible for reviewing and discussing: (i) the Company's earnings press releases, as well as financial information and earnings guidance provided by the Company to analysis and rating agencies; and (ii) the adequacy of the Company's internal and disclosure controls."  (¶¶ 56, 61.)

### H.     "Prejudicial Entanglements"

Plaintiff alleges that various "prejudicial entanglements" between the defendants, such as professional relationships, friendships, and "entangling financial alliances, interests and dependencies," would prevent Macy's directors from acting in compliance with their fiduciary obligations and approving a demand to take legal action against the other defendants.  (¶ 103).  Specifically, Plaintiff alleges that (1) various defendants or entities associated with defendants have donated to the Carnegie Hall Corporation ("Carnegie Hall"),[5] where defendant Lundgren is a Trustee and a member of two committees and where defendant Weatherup at one time served with Lundgren as a Trustee, and/or to the Andrew Carnegie Society (¶¶ 22, 25, 26, 29, 31); (2) Macy's purchases telecommunications services from Verizon Communications, Inc., to which defendant Neubauer serves as a director (¶ 26); (3) Morgan Stanley & Co., to which defendant Feldberg serves as a Senior Advisor, was a financial advisor to May's board of directors in connection with the merger between Macy's and May (¶ 29); (4) Macy's has

---

[5]  Plaintiff alleges that von der Heyden, Federated, Macy's, Verizon Communications, Morgan Stanley & Co., and UBS Global Asset Management have donated to Carnegie Hall (¶¶ 22, 26, 29, 31) and that Weatherup, Morgan Stanley and Co., and the Verizon Foundation have donated to the Andrew Carnegie Society (¶¶ 22, 25, 26, 29).  According to Plaintiff, Neubauer is a director at Verizon Communications and Feldberg is a director to UBS Global Asset Management and a Senior Advisor to Morgan Stanley & Co. (¶ 22, 29.)

served on the corporate advisory board for the University of Arizona's Terry Lundgren Center for Retailing, named for defendant Lundgren (¶ 22); (5) defendant Weatherup was chairman and CEO of Pepsi Bottling Group, Inc. at the same time that defendant Kronick served on Pepsi's board of directors (¶¶ 25, 28); (6) defendants Neubauer and Pichler both received MBAs from the University of Chicago, to which Neubauer currently serves as a trustee and to which Morgan Stanley & Co. has donated money (¶¶ 26, 29); (7) defendant Neubauer is the Chairman and CEO of Aramark, for which Mr. von der Heyden has served as a director (¶¶ 26, 31); and (8) Macy's is a sponsor of the Meyer Feldberg Distinguished Fellowship program at Columbia University, where defendant Feldberg received a PhD in Management and Strategy.  (¶ 29.)

## II.    Defendants' Rule 23.1 Motion to Dismiss

### A.    Legal Standard

Rule 23.1 of the Federal Rules of Civil Procedure requires a plaintiff in a shareholders' derivative action to state with particularity:  (1) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (2) the reasons for not obtaining the action or not making the effort.  Fed. R. Civ. P. 23.1(b)(3).  Defendants have moved to dismiss Plaintiff's Complaint on the grounds that Plaintiff did not present its claims to the Macy's Board and has failed to allege with particularity reasons that would excuse it from doing so.  In deciding a motion to dismiss for failure to satisfy Rule 23.1's particularity requirement, the Court must accept as true all well-pleaded allegations and reasonable

inferences drawn therefrom.  *See, e.g., In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 598 (S.D.N.Y. 2007).

"[I]n the usual case, a shareholder seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired.  However, demand may be excused where a shareholder is able to show that demand would be futile."  *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (internal citations and quotation marks omitted). "Pre-suit demand requirements, and the futility exceptions thereto, are governed by the law of the state of incorporation," in this case Delaware.  *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006).

Under Delaware law, when a shareholder's derivative action challenges a decision of the board of directors, the court determines whether pre-suit demand is required using the test described in *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984).  Under *Aronson,* demand is required unless "under the particularized facts alleged, a reasonable doubt is created as to whether:  (1) the directors are disinterested and independent, and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  473 A.2d at 814.  "[I]f either prong is satisfied, demand is excused."  *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).

When a shareholder's derivative action does not challenge a particular business decision made by the board as a whole, the court applies the test for demand futility described in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).  *See, e.g., Sampson v. Robinson*, Nos. 07 Civ. 6890 & 07 Civ. 5867, 2008 WL 3884386, at *4 (S.D.N.Y. Aug. 20, 2008); *see also Guttman v. Huang*, 823 A.2d 492, 499 (Del. Ch. 2003) (applying

*Rales* test where plaintiffs alleged that the defendant-directors individually breached their fiduciary duties by purposely trading in their individual capacities while in possession of material, adverse, and nonpublic information); *Fink v. Weill*, No. 02 Civ. 10250, 2005 WL 2298224, at *2, 3 (S.D.N.Y. Sept. 19, 2005) (applying *Rales* test where plaintiff accused directors of, *inter alia*, failing to disclose risky transaction in proxy statement); *In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d 317, 322 (S.D.N.Y. 2008) (applying *Rales* test where plaintiffs alleged that the board failed to disclose adverse information); *In re IAC/Interactivecorp*, 478 F. Supp. 2d at 596–98 (applying *Rales* test to demand relating to claim that defendants "caused the Company to improperly misrepresent [its] financial prospects . . . and failed to correct [its] publicly reported financial results and guidance.").  Under the *Rales* test, a plaintiff must provide particularized allegations that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. "Thus, in examining 'whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations,' the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand."  *Rattner v. Bidzos*, C.A. No. 19700, 2003 WL 22284323, at *8 (Del. Ch. Sept. 30, 2003).  Directors are deemed not to be disinterested and independent if they were "incapable, due to personal interest or domination and control, of objectively evaluating a demand, if made, that the Board assert the corporation's claims that are raised by plaintiffs or otherwise remedy the alleged injury." *Brehm*, 746 A.2d at 257.

The *Aronson* test applies to Plaintiff's claims related to the Board's approval of a $4 billion authorization to Macy's share repurchase program.  (*See* Defs.' Mem. 7; Opp'n Mem. 6 n.4.)  The *Rales* test applies to Plaintiff's claims relating to Macy's allegedly false and/or misleading public statements and claims relating to alleged insider selling. (*See* Defs.' Mem. 7; Opp'n Mem. 6 n.4.)

At the time this action was filed, the Board was comprised of ten members: defendants Lundgren, Neubauer, Roche, Whittington, Pichler, Feldberg, von der Heyden, Levinson, and Weatherup, and non-party Stephen F. Bollenbach.[6]  When the board is comprised of an even number of directors, demand is excused if at least half of those directors are interested and/or not independent.  *See, e.g., In re IAC/InterActiveCorp*, 478 F. Supp. 2d at 599.

In this case, therefore, a showing that five of the ten Macy's directors were either interested or not independent would excuse the demand requirement under either the *Aronson* or the *Rales* test.  *See, e.g., Sampson*, 2008 WL 3884386, at *4 ("[The *Rales*] test essentially consists of the first part of the *Aronson* test (asking whether board members are interested and/or independent), without the corresponding review of the business judgment rule."); *In re Morgan Stanley*, 542 F. Supp. 2d at 322 ("The *Rales* test essentially eliminates the business judgment rule prong of the *Aronson* test and focuses solely on whether the pleadings create a reasonable doubt that a majority of directors are disinterested and independent.").  Therefore, the Court turns first to the question of

---

[6]  In its Amended Complaint, Plaintiff alleges that the board was comprised of nine members when the action was filed, and that Bollenbach subsequently joined the board.  (¶ 100.)  Plaintiff now apparently concedes that Bollenbach joined the board on June 13, 2007, one week before the action was filed.  (Opp'n Mem. 2 n.2.)

whether any or all of Macy's directors were not independent and/or interested with respect to any of the challenged transactions.

### B.      Independence of the Macy's Directors

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816.  "Independence is a fact-specific determination made in the context of a particular case."  *Beam ex. rel. M. Stewart Living v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

Plaintiff challenges the independence of seven director-defendants based on their allegedly "entangling" professional, personal, and financial relationships with other defendants or with companies with which other defendants are associated.  (¶ 103.) These "prejudicial entanglements" include, for example, shared professional or educational backgrounds, donations by directors or entities associated with those directors to entities associated with other directors, and business relationships between these entities.  (¶¶ 22–32, 103; *see supra*, Section I.H.)  Plaintiff argues that Macy's directors would have been unwilling to commence this litigation because these "extraneous considerations cloud their minds."  (Opp'n Mem. 12–13.)

In order to create a reasonable doubt about an outside director's independence based on personal or business relationships, a plaintiff must allege particular facts "indicating that a relationship . . . is so close that the director's independence might *reasonably* be doubted."  *Stewart*, 845 A.2d at 1051.  "Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient . . . ." *Id.* at 1050.  The ultimate question is whether due to the relationship or other

circumstances, the director "would be more willing to risk his or her reputation than risk the relationship." *Id.* at 1052.

Plaintiff does not allege particularized facts from which the Court can reasonably infer that any director would be improperly influenced by any of these relationships or interests. "The fact that . . . director[s] . . . sat on the same boards of other boards of directors of other companies does not in itself establish lack of independence." *Langner v. Brown*, 913 F. Supp. 260, 266 (S.D.N.Y. 1996); *see also, e.g., Halpert Enters. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005). The alleged business relationships are minor and appear to benefit the affected directors indirectly if at all.[7] Likewise, Plaintiff's allegations regarding certain directors' ties to non-profit organizations and universities do not suggest any relationship so close or significant as to compromise the director's business judgment. *See, e.g., Fink v. Weill*, 2005 WL 2298224, at *2 (finding demand not excused by allegations regarding various professional, social, and business connections dealings between directors, where the complaint did not "explain how these connections would likely impede the board members' ability to assess independently a demand for corrective action herein.").[8] Whether considered individually or in the

---

[7] Furthermore, some of Plaintiff's allegations involve entities with respect to which it is not alleged that any director has any relationship. For example, some of the allegations relate to donations made to the Andrew Carnegie Society. However, while Plaintiff alleges that Lundgren and Weatherup have ties to the Carnegie Hall Corporation, it makes no allegation linking this organization, or either defendant, to the Andrew Carnegie Society, presumably an independent entity.

[8] Plaintiff cites *In re New Valley Corp. Derivative Litigation* for the proposition that "even if 'the actual extent of these relationships is not altogether clear' at the pleading stage, 'the existence of these interests and relationships is enough to defeat a motion to dismiss.'" No. Civ. A. 17649, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001). However, the relationships at issue in that case are readily distinguishable from those alleged by Plaintiff. In *New Valley*, the Plaintiffs challenged the board's approval of a $55 million purchase of stock from its controlling shareholder, which at the time was in need of a cash influx. *Id.* at *1–3. Of the eight New Valley directors, two were major shareholders in the seller, another was "employed by and received substantial compensation from" the seller, and two others had received $30,000 each from the seller for agreeing to be a director nominee in an unrelated proxy bid. *Id.* at *7. In the instant case, by contrast, the alleged "entanglements" have no relation to the challenged transaction.

aggregate, Plaintiff's allegations regarding the Macy's directors' "entanglements" do not give rise to a reasonable doubt regarding the independence of any director.

### C.      Interestedness of the Macy's Directors

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936.  "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.*  Furthermore, "a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Id.*

### 1.      The Directors' Potential Liability

While a director is not deemed interested due to the "mere threat" of personal liability in a proposed legal action, "a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." *In re Veeco Instruments*, 434 F. Supp. 2d at 274.

Plaintiff alleges that if this action were to proceed (1) all of the director-defendants would face a substantial likelihood of liability because they have "imputed knowledge" that the merger was failing and that Macy's forecasts were too rosy; and (2) the four director-defendants who were members of the Audit Committee had "a special duty to know and understand Macy's financial statements and ensure compliance with legal and regulatory requirements" and would face a substantial likelihood of liability for "recommending the filing of false and/or misleading information with the SEC and

failing to ensure the integrity of the Company's internal controls and disclosure controls."

(Opp'n Mem. 11–12.)

> a. **The Director-Defendants Are Not Imputed With Knowledge That The Merger Was Failing Or That Macy's Forecasts Were False**

Plaintiff contends that all the director-defendants are likely liable because the merger concerned Macy's "core" business, and therefore knowledge that the merger was failing and that Macy's financial forecasts were false may be imputed to the directors.  To support this proposition, plaintiff relies on *In re Biopure Corp. Derivative Litigation*, 424 F. Supp. 2d 305, 308 (D. Mass. 2006) and *In re Keyspan Corp. Securities Litigation*¸ 383 F. Supp. 2d 358, 387–88 (E.D.N.Y. 2003).  Neither decision supports a finding of substantial likelihood of director liability in this case.  In *Biopure*, the court reasonably inferred that directors had knowledge that the FDA had issued a clinical hold[9] with respect to a drug that was their company's principal product.  An inability to market the suspect drug would have put the company itself in jeopardy.  *Id.* at 307–08.  Plaintiff, by contrast, does not argue that Macy's directors had imputed knowledge of a discrete fact or event that would put its survival at issue.  Rather, plaintiff seeks to impute awareness of a subsidiary fact—that sales in the first quarter of 2007 would drop below forecasts— to further infer that directors had constructive knowledge that the merger was "failing." It is hardly reasonable to infer, as plaintiff does, that the merger was failing or that the Company was in jeopardy because first quarter 2007 revenues were $5.92 billion

---

[9] "A clinical hold is an order issued by FDA . . . to delay a proposed clinical investigation or to suspend an ongoing investigation [of a drug in development]. . . . When a proposed study is placed on clinical hold, subjects may not be given the investigational drug.  When an ongoing study is placed on clinical hold, no new subjects may be recruited to the study and placed on the investigational drug; patients already in the study should be taken off therapy involving the investigational drug unless specifically permitted by FDA in the interest of patient safety."  21 C.F.R. § 312.42 (a)

compared to a projected $6-6.1 billion.  Regardless of its financial importance, it is not reasonable to infer that Macy's directors knew or should have known that actual sales for the first quarter would be lower than projected and Plaintiff provides no factual basis for this inference.  Certainly mere membership on a board of directors is insufficient to support such an inference.  *See In Re Keyspan*, 383 F. Supp. 2d at 387 ("The cases . . . in which courts charged defendants with knowledge of negative information by reason of their status [within the company] involved circumstances far more suggestive of their direct access to such information.").

### b.   The Members of the Audit Committee Do Not Face a Substantial Likelihood of Liability

Plaintiff contends that demand was futile at least as to the Audit Committee members (Neubauer, Roche, Whittington and Vander Heyden) because they face a substantial likelihood of liability in the instant case and, therefore, are interested directors.  Demand is not futile simply because the directors would be asked to sue themselves or because the directors approved the transaction at issue.  *Brehm*, 746 A.2d at 257 n.34 (citing *Aronson*, 473 A.2d at 817–18); *see also, e.g., Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983) (holding that allegation that directors previously approved challenged transactions or that all directors are named as defendants in the suit are insufficient to excuse demand); *In re Morgan Stanley*, 542 F. Supp. 2d at 325 ("Plaintiffs' repeated assertions that a demand on the board would be tantamount to asking Defendants to 'sue themselves' . . . [does] not create a reasonable doubt as to disinterestedness, as courts have consistently found.").  Rather, the Court must determine whether Plaintiff has pled *particularized* facts that indicate a "substantial likelihood" that

the members of the Audit Committee will face liability for the allegedly misleading statements.

Plaintiff argues that the directors on the Audit Committee face liability due to their alleged role in "allowing" Macy's to make public statements "that represented that the Merger was a success," while in possession of adverse non-public information. (Opp'n Mem. 11.)  Yet the Complaint does not include particularized factual allegations indicating that any of these directors knew or should have known that any of the allegedly misleading statements were false or incomplete.  Plaintiff does not identify any specific information from the relevant period that was available to these directors, either based on their positions as Macy's directors or as members of the Audit Committee, that would have led them to question Macy's statements regarding the merger.

The Complaint does allege that the members of the Audit Committee were responsible for "reviewing and discussing . . . the Company's earnings press releases, . . . financial information and earnings guidance . . . and . . .disclosure and internal controls," and "participated in the wrongdoing" by preparing and/or failing to correct the allegedly false statements at issue.  (¶¶ 26, 28, 30–32, 104); *see supra*, Section I.G.  However, these general allegations, based simply on the fact that a defendant was a member of a board or committee, without more, are insufficient as a matter of law.  *Ferre v. McGrath*, No. 06 Civ.1684 (CM), 2007 WL 1180650, at *6 (S.D.N.Y. Feb. 16, 2007) (rejecting argument that directors knew of corporation's wrongful business practices due to membership on parent company's audit committee); *Halpert Enters.*, 362 F. Supp. 2d at 429, 432 (rejecting plaintiff's argument that defendants were aware of unlawful scheme

by virtue of their positions on "supervisory board committees, such as the Audit Committee, [and] the Governance Committee").

Though the Complaint contains some detail regarding the alleged responsibilities of the Audit Committee, it includes no particular allegation regarding the nature of the adverse non-public information Plaintiff believes would subject these defendants to a substantial likelihood of liability.  Plaintiff's conclusory allegations that defendants failed to disclose "that the integration of former May stores was failing" (¶ 71; *see also* ¶¶ 61, 73) or that they issued financial guidance that was known to be unattainable (¶ 76) clearly do not constitute particular facts from which the Court could infer a substantial likelihood of liability.  *See Guttman*, 823 A.2d at 493–94 (granting motion to dismiss and noting plaintiffs' failure to plead "real facts—*e.g.,* about the board's knowledge of the accounting problems at the company or the company's audit committee process," and instead "substituting conclusory allegations for concrete assertions of fact"); *In re Citigroup Inc. Shareholders Litig.*, No. 19827, 2003 WL 21384599, at *1 (Del. Ch. June 5, 2003) (granting motion to dismiss where plaintiff alleged that director-defendants "either knew about or should have known about the [illegal] transactions" without particularized allegations to support claim that "directors had actual knowledge of the allegedly illegal practices described in the Amended Complaint or that the directors either knew or should have known that there were material inadequacies in the corporation's internal controls").

The only specific information Plaintiff alleges was not disclosed was the fact that May stores experienced poor sales both pre- and post merger.  (*See, e.g.,* ¶¶ 3, 5, 6, 51, 65, 67, 70, 72, 75, 76.)  Plaintiff's own allegations reveal, however, that May's pre-

merger sales decline were disclosed in May's SEC filings (¶¶ 62–63.)  Furthermore,
Macy's post-merger sales forecasts are not false or misleading simply because May
experienced difficulties *prior* to the merger.  As Plaintiff acknowledges, Macy's
predictions regarding the combined company were based in part on benefits resulting
from the merger itself, such as "consolidation of central functions, division integrations,
and the adoption of best practices." (*See, e.g.,* ¶ 69.)  With respect to post-merger sales,
Plaintiff repeatedly alleges that sales at former May stores "continued to decline" after
the merger.  (¶ 6; *see also, e.g.,* ¶¶ 51, 65, 70.)  But this was hardly inside information,
having been disclosed on more than one occasion in the Company's 8K filings.  (Defs.'
Mem. 3 n.5, 22.)

 In fact, the Complaint suggests that negative sales information was reported in a
timely fashion.  Plaintiff alleges that Macy's sales figures did not include sales from the
former May stores until February 2007.  (¶ 9.)  On March 8, 2007, Macy's reported "flat"
sales for February.  (¶ 81.)  In the following months, Macy's reported "disappointing"
sales for March and April 2007 (¶¶ 83–85), and allegedly reported in May 2007 that sales
at new stores had declined during the first quarter of the year, that former May customers
had rejected the rapid conversion, and that Macy's coupon policy had damaged sales
(¶ 85).  Plaintiffs make no particularized allegation that any member of the Audit
Committee (or anyone else) knew or should have known that sales were down, or that the
merger was not meeting expectations at any time before this information was disclosed in
the first quarter of 2007.  (*See* ¶¶ 81–87.)

 Plaintiff also argues that because Macy's divested May's Bridal Group, which
May was allegedly "relying on . . . to benefit future results" (¶ 4), the defendants "knew

20

the Company may suffer from declining sales" (Opp'n Mem. 9).  According to the

Complaint, however, the divestment was public information.  (*See* ¶ 4.)  Furthermore,

Plaintiff's allegations regarding the importance of the Bridal Group are wholly

conclusory.  (*See, e.g.,* ¶ 65 ("May's only hope that its history of declining sales would

turn around hinged on the success of certain of its investments such as May's Bridal

Group").)  Plaintiff also suggests that liability may be based on Macy's attribution of

weak sales in February and March 2007 to bad weather and weak sales in "home-related

merchandise categories" rather than to the "historical sales lag at May locations and a

failing integration."  (¶¶ 81, 83; Opp'n Mem. 7–8, 9.)  Plaintiff does not allege facts

indicating that the Audit Committee directors were in possession of information that

would lead them to question this attribution.

      In sum, Plaintiff alleges that Audit Committee had special access to financial

information and responsibility for financial statements and guidance, but fails to allege,

except in a conclusory manner, any adverse non-public information of which directors on

this committee would have become aware. The Court therefore finds that Plaintiff has

failed to plead with the requisite particularity that demand should be excused due to a

substantial likelihood of liability faced by the members of the Audit Committee.[10]

---

[10]  Notably, defendants Lundgren and Houget were named as defendants in a class action complaint also filed in this district alleging securities fraud based on many of the same statements cited in Plaintiff's Complaint.  (¶¶ 22, 23); Consolidated Am. Compl., *In re Macy's Inc. Sec. Litig.*, 07 Civ. 4774 (S.D.N.Y. Nov. 19, 2007).  Judge Hellerstein dismissed the complaint with leave to amend, finding that plaintiffs had not adequately alleged that the challenged statements were false or misleading and had not adequately alleged scienter, Tr., *In re Macy's*, 07 Civ. 4774 (May 19, 2008), then dismissed the action with prejudice after Plaintiffs failed to file an amended complaint within thirty days.  Final Judgment, *In re Macy's*, 07 Civ. 4774 (July 15, 2008).

### 2.     Alleged Insider Selling

Plaintiff alleges that director-defendants Lundgren, Levinson, and Weatherup are interested because they face a substantial likelihood of liability due to their sales of Macy's stock while in possession of adverse, material, non-public information.  (¶ 101.) "Cursory allegations that a director made sales of company stock in the market at a time when he possessed material, nonpublic information are not sufficient to find a director interested for demand-futility purposes."  *In re IAC/Interactive Corp.*, 478 F. Supp. 2d at 603; *see also, e.g., Ferre*, 2007 WL 1180650, at *5 ("[T]he mere sale of stock, accompanied by a conclusory allegation that a director 'knew or was in a position to know' inside information at the time of the sale, is insufficient to create a reasonable doubt as to the director's lack of interest under *Rales*.").  Rather, the inquiry should focus on "whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from the particularized facts pled that) they knew material, non-public information about the company's financial condition."  *Guttman*, 823 A.2d at 502.

As discussed above in connection with the other director-defendants' alleged liabilities, Plaintiff's Complaint includes no particularized facts regarding the nature of the adverse non-public information that Lundgren, Levinson, and Weatherup supposedly possessed at the time these sales were made.  Such allegations do not suggest a substantial likelihood of liability for insider trading.  *See, e.g., Guttman*, 823 A.2d at 503 (holding allegations regarding insider trading insufficient to excuse demand where allegations regarding directors' knowledge were "wholly conclusory" and lacked "well-

pled particularized allegations of fact detailing . . . the information that would come to [the directors'] attention in [their] roles [at the company], and any indication as to why they would have perceived the accounting irregularities"); *Rattner*, 2003 WL 22284323, at *10 n.53 (holding allegations regarding insider trading insufficient to excuse demand where "the conclusory assertions . . . fail to allege with particularity what information the directors knew and how they acquired such knowledge). At least with respect to Levinson and Weatherup, Plaintiff alleges their knowledge based solely on their position as directors for Macy's. These allegations are insufficient. *See, e.g., Ferre*, 2007 WL 1180650, at *6 ("Allegations of knowledge explained solely by the directors' service as directors, without more, are insufficient as a matter of law—even where, as here, the plaintiff alleges that the matters in suit relate to the corporation's 'core' business.").

Furthermore, Plaintiff makes no allegation indicating that either the timing or the size of these director-defendants' stock sales were unusual relative to any of these individuals' historical trading practices. *See, e.g., Rattner*, 2003 WL 22284323, at *10 (holding demand not excused due to alleged insider selling and noting that complaint included no "particularized facts that could leading to the inference that the timing of the trades reflected . . . impermissible insider trading").

For these reasons, Plaintiff has not pled particularized facts indicating that director-defendants Lundgren, Levinson, or Weatherup face substantial liability for their sales of stock in the spring of 2007.

### 3. Directors' Alleged Unwillingness to Take Action Against Members of the Compensation Committee

Plaintiff alleges that directors Lundgren, Roche, and Whittington would be unable to consider a demand on its merits because the other defendants in this action include various members of the Compensation and Management Development Committee (¶¶ 106, 107.)  Plaintiff argues that the three directors would not institute the instant action because to do so would jeopardize each director's financial compensation.  (*Id.*)

As a threshold matter, this argument fails with respect to Roche and Whittington because Plaintiff has not alleged that the Compensation Committee has any role in setting director compensation.  While Plaintiff vaguely alleges that the members of the Compensation Committee "singularly control the other defendants' awards" (¶ 107), it elsewhere quotes the Macy's charter, which states that the Committee's purpose is "to establish and administer the Company's policies, programs, and procedures for the annual and long-term compensation of the company's executives, to oversee employee benefit programs and to ensure appropriate succession plans for the CEO and key executive positions." (¶ 57.)  Given these contradictory allegations, the Court credits the more specific statement in the charter.  *See, e.g., Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (affirming dismissal where "attenuated allegations" in complaint were contradicted by other, more specific allegations); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.").

However, even if Plaintiff could allege that the Compensation Committee determines director compensation, these allegations do not create a reasonable doubt about the directors' independence.  The essence of Plaintiff's argument is that the directors are not independent because they receive compensation as directors and wish to continue to do so.  This basis for excusing demand has been repeatedly rejected under Delaware law.[11]  *See, e.g., Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988), overruled on other grounds, *Brehm*, 746 A.2d 244 ("The only averment permitting such an inference [of financial interest on the part of the directors] is the allegation that all . . . directors are paid for their services as directors.  However, such allegations, without more, do not establish any financial interest."); *In re Merrill Lynch Investment Management Funds Sec. Litig.*, 434 F. Supp. 2d 233, 241 (S.D.N.Y. 2006) ("The mere fact that a director receives compensation . . . does not excuse demand."); *Fink v. Komansky*, No. 03 Civ. 0388 (GBD), 2004 WL 2813166, at *7 (S.D.N.Y. Dec. 8, 2004) (rejecting argument that director-defendants would not jeopardize their compensation by initiating a suit against the board of directors); *Langner*, 913 F. Supp. at 266 ("It is well-settled that the receipt of directors' fees does not constitute a disqualifying interest for the purposes of the demand requirement.").  The argument fares no better when repackaged as an unwillingness to antagonize members of the Compensation Committee.  *See, e.g., Halpert Enters.*, 362 F. Supp. 2d at 429, 433  (holding that demand was not excused where plaintiff alleged that directors would not vote to sue co-directors on compensation committee in order to protect their compensation); *In re Pozen Shareholders Litig.*, 2005 WL 3035783, at *14

---

[11]  However, Delaware Supreme Court has noted the answer might be different if the fees are excessive.  *Orman v. Cullman*, 794 A.2d 5, 29, n.62  (Del. Ch. 2002):  "It is worth noting that these cases were based on circumstances in which the fees paid to directors were customary and usual in amount. This Court's view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee."

(N.C. Super. 2005) (rejecting argument that "members of the Compensation Committee have the power to decide whether certain directors continue to be compensated and that as a consequence the other directors would be motivated to act in compliance with their desires," as "too conclusory to establish that demand would have been futile").

### 4.      Directors' Unexercised Stock Options

Plaintiff alleges that various directors are interested because they hold stock options that can be redeemed only upon continued service with the company.[12]  (¶ 102.) Though plaintiff makes no mention of these stock options in its opposition brief, the Court interprets Plaintiff's argument to be that the Macy's directors would be unwilling to pursue the instant suit because they would risk removal from the board by doing so. This argument is speculative and is rejected.  Plaintiffs allege no particularized facts indicating that any such consequences would be likely to result from any director's decision to commence the instant lawsuit.  Furthermore, as noted above, "ordinary director compensation alone is not enough to show demand futility."  *A.R. DeMarco Enters., Inc. v. Ocean Spray Cranberries Inc.*, No. Civ. A. 19133-NC, 2002 WL 31820970, at *5 (Del. Ch. Dec.4, 2002).  Plaintiff does not allege that the value of the stock options received by any director is unusually large or excessive.

### 5.      "Insured vs. Insured" Exclusion in Insurance Policy

Finally, Plaintiff argues that demand was excused because any directors and officers' liability insurance policy ("D&O policy") that covers the Macy's directors would contain an "insured vs. insured exclusion," which would exclude from coverage

---

[12]  Plaintiff alleges that director-defendants Lundgren, Hoguet, Levinson, Neubauer, Pichler, Roche, Feldberg, Whittington, and von der Heyden each hold a large number of stock options, many of which remain unexerciseable.  (¶¶ 22–28.)

any liability resulting from an action brought directly by Macy's against its own directors, but would provide coverage if the same action were brought derivatively. (¶ 115.)  Curiously, Plaintiff does not allege that Macy's actually holds a D&O policy, but rather, that if a Macy's D&O policy exists, it would contain this type of exclusion. Speculative allegations regarding the terms of a hypothetical insurance policy do not raise a reasonable doubt regarding the directors' disinterest or independence.

However, even if Plaintiff had alleged that the Macy's directors held a D&O policy that contained an "insured vs. insured exclusion," this fact would not excuse demand.  *See, e.g., Halpert Enters.*, 362 F. Supp. 2d at 433 ("That the insurance policy indemnifying defendants would not cover their liability were the corporation itself to bring suit against them is also not a sufficiently particular basis for inferring demand futility."); *Ferre*, 2007 WL 1180650, at *8 (rejecting argument that existence of an 'insured versus insured' exclusion in a D&O policy rendered demand futile); *Decker v. Clausen,* Civ. A. Nos. 10,684, 10,685, 1989 WL 133617, at *2 (Del. Ch. Nov.6, 1989) (finding that allegation that "liability insurance would not cover an action brought by the company against its own directors" was merely a "variation[ ] on the 'directors suing themselves' . . . refrain"); *Caruana v. Saligman,* Civ. A. No. 11135, 1990 WL 212304, at *4 (Del. Ch. Dec.21, 1990) (same).

### D.       Totality of the Circumstances

The Court has also considered whether the totality of Plaintiff's allegations might excuse demand, and finds that, whether considered individually or in the aggregate, the allegations do not create a reasonable doubt regarding any director's disinterestedness or independence.

### E.    Business Judgment Rule

Finally, Plaintiff alleges that demand to bring an action challenging the $2 billion stock buyback program was excused under the second prong of the *Aronson* test because the Board's authorization of the buyback was not "the product of a valid exercise of business judgment." *Aronson,* 473 A.2d at 814.  It is presumed that directors make business decisions "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.* at 812.  Therefore, in order to excuse demand to bring an action challenging the stock buyback, Plaintiff must "plead with particularity facts that create a reasonable doubt as to the good faith or reasonableness of a board's investigation." *Halpert Enters.*, 2007 WL 486561, at *5 (citing *Spiegel v. Buntrock,* 571 A.2d 767, 777 (Del. 1990)).

The Court interprets Plaintiff's argument to be that the authorization was not reasonable because the directors knew or should have known that Macy's stock was overvalued, and that Lundberg, Levinson, and Weatherup did not act in good faith because they authorized the buyback shortly before they sold their own shares.  (¶ 105; Opp'n Mem. 13–14.)  However, as discussed, Plaintiff has not alleged with particularity that any director was in possession of adverse non-public information or that any director knew or should have known that Macy's share prices were inflated.  With respect to Plaintiff's argument that directors did not act in good faith, Plaintiff does not allege that the buyback program facilitated any director's stock sales or otherwise provided a benefit to them.  Therefore, Plaintiff has not raised a reasonable doubt regarding whether the authorization of the stock buyback was a valid exercise of business judgment.

## **CONCLUSION**

For the reasons discussed herein, Defendants' motion to dismiss **[33]** is granted. Because the Court finds that demand was not excused, it does not address Defendants' other grounds for dismissal.

In its opposition brief, Plaintiff requested leave to amend its Complaint in the event of dismissal. (Opp'n Mem. 25 n.21). Under Rule 15(a) of the Federal Rules of Civil Procedure, a court should freely grant leave to amend "when justice so requires." The Complaint is therefore dismissed without prejudice and Plaintiff is granted until November 1, 2008 to amend its Complaint, if it can, to allege with particularity the reasons why pre-suit demand was not made.

SO ORDERED.

Dated: New York, New York
September 30, 2008

Richard J. Holwell
United States District Judge

29